UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETITION FOR A WRIT OF HABEAS CORPUS; 28 USC § 2254

EVIDENTIARY HEARING REQUESTED

Case No._____

PETITIONER,

**JOHN EVANS**,
Prisoner Number W61607

Place of Confinement:
Massachusetts Correctional Institution, Shirley-Medium
P.O Box 1218
Shirley, MA 01464

v.

RESPONDENTS,

Paul Verdini, Superintendent
Massachusetts Correctional Institution, Shirley-Medium
P.O Box 1218
Shirley, MA 01464

The Attorney General of the State of Massachusetts, Thomas Reilly.

## **PETITION**

1.  Name and location of court which entered the judgment of conviction under attack:  Suffolk Superior Court, 90 Devonshire Street, Boston, MA 02109.

2.  Date of judgment of conviction:  November 8, 1996.

3.  Length of sentence:  Indictment # 001, murder, life sentence;
    #s 005 & 006, possession of firearm, and #s 011 & 012, assault dangerous weapon, each maximum five years-minimum of four years, all to be served concurrent with sentence on #001, sentence credit 289 days. The following guilty verdicts were placed on file with no sentences

imposed: #s 002 & 003, possession of ammunition, and #004, discharge of firearm, and # 007, operating motor vehicle-leaving scene of accident-property damage, and # 008, negligent operation of motor vehicle, and #s 009 & 010, operating motor vehicle-leaving scene of accident-personal injury. Thus, the only sentence petitioner is now serving is the life sentence on #001.

4. Nature of offense involved:  See number 3 above.

5. Pleas?  Not guilty.

6. Kind of trial:  Jury.

7. Did you testify at the trial?  Yes.

8. Did you appeal from the judgment of conviction?  Yes.

9. (a)  Name of court:  Supreme Judicial Court of Massachusetts (SJC).
9. (b)  Result:  Judgments affirmed.
9. (c)  Date of result:  April 16, 2003..

9. (d)  Grounds raised:

1. Newly available material and exculpatory evidence from Tasha Smith and Robert Brown III merits a new trial after an evidentiary hearing.

2. The trial judge interfered with defendant's constitutional and common law cross-examination rights to show bias, when he erroneously barred petitioner from specifically naming the charges then pending in the same county against key Commonwealth witness, Alton Clarke.

3. Trial judge's erroneous ruling, constructively preventing direct examination of Eddie Hawkins, who had probative evidence supporting petitioner, deprived petitioner of his constitutional right to defend himself.

2

4. Erroneous admission and unduly prejudicial admission of Commonwealth's witness, Marvette Neal's purported statements to police investigators and his grand jury testimony.

5. Improper prejudicial prosecutorial remarks in closing.

    (a) argument to bolster Alton Clarke's credibility;

    (b) argument disparaging Willie Wiggins' evidence;

    (c) argument appealing for sympathy.

6. Ineffective assistance of counsel.

    (a) failing to object to testimony of victim's mother, in that prejudice in the inherent appeal for sympathy connected with purpose and intent of having her testify far outweighed cumulative and marginal relevance of her testimony;

    (b)    failing to object to irrelevant and unduly prejudicial prior bad acts evidence given by Commonwealth's witness, Gene Robbins, from Lexus of Norwood, which later created undue prejudice in direct and cross-examination of petitioner;

    (c)    failing to seek severance so that petitioner could have obtained exculpatory evidence from co-defendant Robert Brown III as well as other evidence from Brown which would have substantially strengthened his case.

7.    Errors regarding the indictment for unrelated discharge of a firearm within 500 feet of a building, G.L. 269,§12E, amounted to ineffective assistance of counsel and deprived petitioner of a fair trial:

3

(a)    lack of evidence to indict;

(b)    misjoinder of offenses;

(c)    prejudicial joinder of offenses and lack of evidence to convict.

8. Trial counsel's failure to investigate and develop forensic evidence amounted to ineffective assistance of counsel.

9. (e)  As the Supreme Judicial Court (SJC) is the highest court in the state, no application for further appellate review could be made to a higher state court. Petitioner, however, timely filed a petition for rehearing with the SJC , which was denied on June 5, 2003.

 9. (f) Petition for Writ of Certiorari was filed in the U.S. Supreme Court by petitioner, No. 03-5691, on August 4, 2003, and it was denied on October 6, 2003.

10.    Motions filed in state court: Yes.
11.
a)  (1) Name of Court: Suffolk Superior Court.

    2) Nature of Proceeding: Motion for New Trial (including addendum), Mass. R. Crim. P. 30(b), with request for evidentiary hearing. Motions for funds were also filed in conjunction with, and related to, the new trial motion.

    3) Grounds raised:

        1. Newly available material and exculpatory evidence from Tasha Smith and Robert Brown III merits a new trial after an evidentiary hearing.

        2. The trial judge interfered with defendant's constitutional and

4

common law cross-examination rights to show bias, when he erroneously barred petitioner from specifically naming the charges then pending in the same county against key Commonwealth witness, Alton Clarke.

3. Trial judge's erroneous ruling, constructively preventing direct examination of Eddie Hawkins, who had probative evidence supporting petitioner, deprived petitioner of his constitutional right to defend himself.

4. Erroneous admission and unduly prejudicial admission of Commonwealth's witness, Marvette Neal's purported statements to police investigators and his grand jury testimony.

5. Improper prejudicial prosecutorial remarks in closing.

    (a) argument to bolster Alton Clarke's credibility;

    (b) argument disparaging Willie Wiggins' evidence;

    (c) argument appealing for sympathy.

6. Ineffective assistance of counsel.

    (a) failing to object to testimony of victim's mother, in that prejudice in the inherent appeal for sympathy connected with purpose and intent of having her testify far outweighed cumulative and marginal relevance of her testimony;

    (b)    failing to object to irrelevant and unduly prejudicial prior bad acts evidence given by Commonwealth's witness, Gene Robbins, from Lexus of Norwood, which later created undue prejudice in direct and cross-examination of petitioner;

(c)    failing to seek severance so that petitioner could have obtained exculpatory evidence from co-defendant Robert Brown III as well as other evidence from Brown which would have substantially strengthened his case.

7.    Errors regarding the indictment for unrelated discharge of a firearm within 500 feet of a building, G.L. 269,§12E, amounted to ineffective assistance of counsel and deprived petitioner of a fair trial:

(a)    lack of evidence to indict;

(b)    misjoinder of offenses;

(c)    prejudicial joinder of offenses and lack of evidence to convict.

8. Trial counsel's failure to investigate and develop forensic evidence amounted to ineffective assistance of counsel.

11. (a) (4) Petitioner did not receive an evidentiary hearing on the motion.
11. (a) (5) Result: Motions denied.
11. (a) (6) Date of Result:  December 30, 1999. After remand by the SJC to reconsider in light of amended rules on motion for funds, denied by orders dated January 3, 2002 and March 1, 2002; motions for clarification and reconsideration were denied by orders dated April 8 and 11, 2002.
11. (b)  Appeal from denial of motions consolidated with direct appeal to the SJC. See above 9 (a)-9 (e).
11. (c)  See above 9 (a)-9 (e).
12.    Concise statement of every ground on which petitioner claims he is being held unlawfully.

Please note that the STATEMENT OF FACTS AND GROUNDS, pages 10-47 below, supports the following grounds, and is incorporated herein by reference.

A.  Ground one:  When the state courts absolutely excluded potentially exculpatory evidence from a witness called by petitioner, they violated his Compulsory Process Clause rights by unduly elevating court-made evidence rules over those rights, thus making the Sixth Amendment right to present a defense superfluous as a tool of a fair process.

B.  Ground two:  When the trial judge, after the voir dire of a prosecution witness that made it clear that the witness would give the jury testimony of no evidentiary value, still permitted the witness to testify over objection, such ruling violated petitioner's Sixth and Fourteenth Amendment rights.

C.  Ground three:  When the trial judge who, in the absence of *Van Ardsall* concerns, forbade the accused from using, in cross-examination of a key prosecution witness, the actual names of the unrelated charges – rape, kidnapping, and assault and battery with dangerous weapon – then pending against the witness in the same county, and only permitted references to them as "serious charges, such ruling violated petitioner's Sixth Amendment Confrontation Clause right to show witness bias.

D. Ground four:  Petitioner was deprived of effective assistance of counsel when his counsel failed to seek severance so that petitioner could have obtained exculpatory evidence from co-defendant Robert Brown III as well as other evidence from Brown which would have substantially strengthened his case.

13.    All of grounds listed in 12 A-D inclusive were previously presented to the state courts.

14.    The petitioner does not have a pending petition for Writ of Certiorari to the Supreme Court of the United States.

15.    Names and addresses of attorneys who represented petitioner in stages of judgment attacked herein:

> The same attorney at (a) preliminary hearing, (b) arraignment and plea, (c) trial, and (d) sentencing:  Albert H. Hutton Jr., Esq., 6 Beacon Street, Boston, MA 02108.

> (e) On appeal:  Emanuel Howard, Esq., P.O Box 66067, Newton, MA 02466-0002.

> (f) In any post-conviction proceeding:  Same as in 15 (e).

> (g) On appeal from adverse ruling in post- conviction proceeding: Same as in 15 (e).

16.    The petitioner was sentenced on more than one indictment in the same court and the same time. See 3, above.

17.    The petitioner does not have any future sentence to serve after he completes the sentences imposed by the judgment under attack.

WHEREFORE, petitioner John Evans prays:

A.    The Court issue a writ of habeas corpus, on one or more grounds or on the cumulative effect of two or more grounds, to have petitioner brought before the Court to the end that he may be discharged from his unconstitutional conviction, confinement and restraint;

B.    The Court require respondents to bring forward the entire record of the state court proceedings, including the transcript of the trial, the record on appeal, other relevant records in the case, and to specify any proceeding in the case that has been reported but not transcribed;

C.    The Court require respondents to file an answer admitting or denying every factual allegation herein;

D.    The Court permit petitioner to respond to any affirmative defense raised by respondents in his answer;

E.    The court allow petitioner, who is indigent, to proceed without prepayment of costs and fees;

F.    The Court allow petitioner to conduct discovery and to expand the record relating to issues raised by this petition;

G.    The Court allow indigent petitioner funds to obtain expert, investigative, and other services necessary for adequate representation in this matter;

H.    The Court conduct a hearing at which proof may be offered concerning the allegations in this petition that respondent does not admit;

I.    The Court allow petitioner sufficient time to brief the issues of law raised by this petition;

J.    The Court, if it concludes that state remedies with regard to any claim in the petition have not been properly exhausted, should hold the petition in abeyance pending exhaustion of state remedies; and

K.    The Court grant petitioner such other and further appropriate relief to which he may be entitled in this proceeding.


Signature of Attorney: EMANUEL HOWARD

9

I declare under the penalty of perjury that the foregoing is true and
correct. Executed on

_Feb 2,2004_ _John Evans_ _____ _ Petitioner

JOHN EVANS

## STATEMENT OF FACTS AND GROUNDS.[1]

**Proceedings at trial.**

John Evans (John), Jimmy Evans (Jimmy), Ronald Tinsley
(Tinsley), and Robert Brown III (Brown) were tried together for first-
degree murder of Lyle Jackson [G. L. c. 265, § 1], and lesser charges
connected with the same incident. John and Jimmy were convicted on all
charges lodged against them; Tinsley was convicted only for possession
of cocaine at the time he was arrested, and Brown was acquitted of all
charges.

**Commonwealth's evidence at trial.**

The four co-defendants left Cortees, a bar on Washington Street,
Dorchester [*3/168*], near its 2:A.M. closing time on January 25, 1995.
From Cortees, the four went to "Conway's" in separate cars. There was
talk about Jimmy and Tinsley wanting to get something to eat.
They went in a Gold Lexus, John driving, to Walaikum's, a
hamburger/sub shop in the Roxbury section of Boston, known to be
open at that time. [*8/43-47*] Versions differ as to what happened after

---

[1] References to trial transcripts will be [vol.. #/page#]; those to the appendix
filed with petitioner's brief to the SJC will be [A.#].

the four arrived there.

Marcello Holliday (Holliday), the victim's best friend [*3/27*], saw all four enter Walaikum's. He observed them whispering to each other regarding the victim, Brown saying, "that's him." Jimmy pulled a chrome handgun; Holliday immediately ran out of the shop and soon heard some gunshot sounds. He returned and saw the victim on the floor spitting up. [*3/41-50,61-62*] (The jury must have disbelieved Holliday's evidence of Brown's "fingering" the victim, because they acquitted Brown.)

Marvette Neal (Neal) did not remember, or denied having made, prior statements tending to inculpate John and Jimmy. The Commonwealth, over objections, used Neal's grand jury testimony, and later used an investigating officer, to get those prior statements before the jury. [*4/174-198; 5/13-17, 19-25; 7/19-270*]

Alton Clarke (Clarke) was in Walaikum's, heard some "clicks," and saw gunman #1 walk in with a silver handgun. Gunman # 1 walked towards the then retreating victim. The victim fell while retreating; then gunman #1 shot the victim several times. Gunman #2 come in, pointed a black handgun at Clarke's chest, and then walked towards the victim. Clarke then backed out of the store, while hearing another shot, but did not see gunman # 2 shoot at the victim. The gunmen then came out and entered the Lexus, gunman # 1 into the driver's seat, and gunman # 2 into the front passenger seat. Clarke did not see the other two; he presumed that they were already in the car because he saw all four seats

occupied as the Lexus drove by. Clarke called 911 merely to report the shooting and to give a license plate number for the Lexus, but he did not leave his name. He saw that Lexus later, with the same four in the same positions, as it drove by on his street during a chase, by many police vehicles, then in progress. Clarke described the gunmen: gunman # 1, only as a black male with short hair, about 25-26 years old, 5'-9" to 5'-10", with a thick build; gunman # 2, only as black man, "much thinner," about 19 years old. He could not supply the names of the gunmen, could not point to anyone in the courtroom or in a photo array as being a gunman, and could not describe clothing worn by either gunman to any degree of certainty. [6/78-97] He was not even sure that gunman # 1 had a "low haircut." [6/135-136]

The car chase ended when the Lexus stopped in a cul-de-sac in Mattapan, another section of Boston. All four were arrested within seconds thereafter. The police recovered two 9mm. handguns seen being tossed out of the car during the chase: a black "H & K" and a silver "Ruger". [4/99-130] No fingerprint evidence tied John to either handgun. [6/51-73] A ballistician tied-in a spent bullet taken from the victim's body to the black H & K, and tied-in the silver Ruger to handgun projectile parts recovered both inside and outside Walaikum's, one of which came from the rug with blood on it. [7/28-83] There was blood on Tinsley's outer garment. Tinsley and the victim had the same blood type, but the blood could have come from cuts Tinsley received as a result of

the foot chase just before he was apprehended. [6/19-26, 34-37, 39-41]
There was no evidence that any of the four co-defendants knew, or had
any previous "problems" with, the victim.

**Defense case.**

    <u>John's testimony</u>. Upon arrival near Walaikum's about 2:40 A.M.,
Jimmy and Tinsley left the car and walked towards the shop, and he saw
Tinsley enter it. John never entered Walaikum's. Brown left the car and
walked in the opposite direction to relieve himself down the street. John
remained near the Lexus, moved to sit in the front passenger seat, and
talked to three people he knew only by their first names: two men (Melvin
and Daniel) and a woman (Tasha). [8/112] Within minutes, he heard
sounds of gunshots coming from the direction of Walaikum's. People
came out of the shop, and those on the street were running away. He
moved to the driver's seat. Brown returned to the rear seat and told him
to pull off, but he would not leave his brother. After Jimmy got into the
front passenger seat and Tinsley got into the rear seat, he pulled off.
After John pulled off, there was some discussion about guns other people
had in the car. Before this, John did not know of anyone carrying a gun.
He did not know anything more about the gun carrying. [8/43-67,70-76,
111-114, 128-129] John did not know the victim, did not have a problem
with him, nor did he say anything to the others about Mr. Jackson.
[8/81-82]

    <u>Jimmy's testimony</u>. He testified that Tinsley entered Walaikum's

first, and he entered behind Tinsley. Jimmy then went outside, and saw that John and Brown were "down by the car." Within two or three minutes, he heard gunshot sounds. Tinsley and others then came out of Walaikum's. Jimmy became fearful and drew a silver handgun for self-protection; the gun accidentally discharged three shots. John and Brown were already in the car when he and Tinsley entered it. Jimmy got into the front passenger seat, and Tinsley into right rear seat. Jimmy told John that he had a gun; John became upset. Jimmy threw his gun out of the car. There was no conversation among the four about the victim on the way to Walaikum's. [9/ 10-29] The silver handgun was his. [9/33-34]

Willie Wiggins testimony. Mr. Wiggins, Walaikum's owner, was standing at the shop's counter facing the front door when a black man shot the victim. John's counsel, pointing to John, asked him: "Did you see that man in your restaurant the night that [the victim] got shot?" His answer was, "No, I didn't." [8/ 186-190]

John called Eddie Hawkins to the stand to testify on inculpatory statements Tinsley made to him. The statements also tended to exculpate John and support his defense. The trial judge excluded the evidence. Neither Brown nor Tinsley testified.


## REASONS FOR GRANTING THE WRIT

### GROUND ONE.
WHEN THE MASSACHUSETTS COURTS ABSOLUTELY EXCLUDED POTENTIALLY EXCULPATORY EVIDENCE FROM EDDIE HAWKINS, A WITNESS CALLED BY PETITIONER, THEY

**VIOLATED HIS COMPULSORY PROCESS CLAUSE RIGHTS BY UNDULY ELEVATING COURT-MADE EVIDENCE RULES OVER THOSE RIGHTS, THUS MAKING THE SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE SUPERFLUOUS AS A TOOL OF A FAIR PROCESS.**

A.    **When the right to present a defense is involved, use of the adversarial system, rather than absolute exclusion, should be the preferred means for dealing with possibly unreliable testimony.**

Few rights are more fundamental in our nation than that of an accused to present his version of the facts in keeping with the Sixth Amendment's Compulsory Process Clause right to present defense evidence and witnesses. *Crane v. Kentucky,* 476 U.S. 683, 687 (1986); *Washington v. Texas,* 388 U.S. 14, 19 (1967). These rights are necessary to ensure that the accused is not deprived of a fair trial. *Id.* at 17-19; *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973).

The United States Supreme Court set out only two requirements for the presentation of a defense witness's testimony: that it be "relevant" and "material" to the defense. *Washington v. Texas,* 388 U.S. at 23. This leaves the "credit and weight of such testimony to be determined by [the factfinder]." *Id.* at 22 (internal quotation marks omitted). Accord, *Crane, v. Kentucky,* 476 U.S. at 688. One year after *Crane,* the majority in *Rock v. Arkansas,* 483 U.S. 44 (1987) solidified an accused's right to present a defense, resulting in an opinion shaped by the requirements of a fair adversarial system, and not one based merely on rules of evidence. That is, when reasonable men could disagree over the reliability of the

testimony of a proposed defense witness, rather than absolute exclusion, the preferred and least restrictive way of dealing with possible unreliability is by such means as corroboration of the testimony, independent evidence, cross-examination, or jury instructions. *Id.* at 61.

### B.    Petitioner's need for Eddie Hawkins' testimony.

The petitioner wished to call Eddie Hawkins (Hawkins or Hawk) based upon a report of his statements to police detectives [O'Leary report, A. 122] at the Essex County House of Correction. Hawkins' statements bolster petitioner's position to this effect: Tinsley was in Walaikum's at the time of the shooting; Tinsley was the shooter ("it's my body, Hawk") and; John [who was Jimmy's - a.k.a. "45's" - brother, merely drove the car away. (Id.][2]

In Hawkins' voir dire, he verified the contents of the O'Leary report on these points: the reason he was in Concord [*10/13*]; he met Tinsley a few years before in another facility and he and Tinsley were cell mates in Concord [*10/14*]; as cell mates, he had talked with Tinsley about a murder, and Tinsley was waiting to go to court on a murder charge [*10/16-17*]; he got the nickname, "45" from talking about the case with Tinsley [*10/19*]; he thinks that Tinsley told him that " he thought he might cop a plea of 18-20," but then Tinsley found that the police couldn't put him at the murder scene but could only put him in the car used to make the getaway from the scene. [*10/25*] Hawkins said that he

---

[2] Hawkins was unavailable [*1/12-20; 8/5-15*] until after John and Jimmy testified. After a side bar conference [*10/4-11*], Hawkins testified in a voir dire.

made up the rest, looking for a deal. [10/18]

John still wished to call Hawkins. Overriding his counsel's argument to let the jury decide what credit and weight they would give to Hawkins' testimony, the trial judge ruled over objection that John could only ask Hawkins "whether or not he had a conversation with Mr. Tinsley regarding the allegations before this court." On that basis, John declined to call Hawkins, and rested his case. [10/28-34]

The judge's ruling effectively deprived petitioner of his constitutional right to defend himself. If John were permitted to conduct a direct examination in the normal manner, Hawkins would have at least made the verifications on the above-mentioned points. Those verifications would have given the jury favorable substantive evidence for John. If Hawkins' testified before the jury that the rest was fabricated, that could have been impeached by the testimony of Detective O'Leary who would have been called by John. [A. 253-254, par. 7][3] Either way, John still would have been warranted to argue in his closing that Tinsley's statements to Hawkins: (1) tended to show that Tinsley had been the shooter in Walaikum's; and (2) bolstered John's testimony about someone else being the shooter which, in turn, would have bolstered petitioner's entire defense.[4]

---

[3] This is similar to the trial judge's permitting the Commonwealth to call Detective Dorch on his report of Neal's alleged statements.

[4] This is congruent with the situation in *Washington*, where he wished to call a co-defendant who would have testified consistently with his defense. *Washington*, 388 U.S. at 16.

The court's action violated John's "compulsory process" rights under the Sixth and Fourteenth Amendments of the United States Constitution.[5] John had testimony of probative value from Hawkins which tended to exculpate him; Hawkins had no competing right. Any restriction on the petitioner's right to call witnesses or on the scope of the examination of those witnesses cannot be arbitrary. Allowing the jury to hear Hawkins testify, verifying parts of the O'Leary report, does not run counter to any legitimate demands of the adversarial system. Hawkins would not be exposed to any loss of rights if he testified. Tinsley would have been able to protect own his rights through his trial counsel. Hawkins' testimony would not likely have the taint of bias or interest usually attributed to a testifying defendant, so it would likely have been more persuasive than John's. See *Arizona v. Fulminante*, 499 U.S. 279, 297-300 (1991). Hawkins' testimony would have been relevant and material, and would have had a substantial positive influence for John: on Tinsley's responsibility for the death of the victim, and on John's defense.[6]

---

[5] Petitioner's opening mentioned Hawkins, but he was limited by the court to saying that Hawkins "is scheduled to [be] a witness ... and he will have some important information ...." [8/29-31] .The judge told the jury "that the witness we scheduled will not be here until tomorrow ...." [9/6] Both of these remarks additionally prejudiced petitioner when he could not deliver on his promise through no fault of his own.

[6] The judge's ruling constructively barred John from examining Hawkins. The arbitrary nature of this can be more appreciated when compared to the judge's rulings on Neal's testimony. If the judge was correct in handling Neal's testimony, he should have permitted Hawkins to testify; conversely, if he was correct in limiting Hawkins' testimony, he should have similarly limited the use of Neal's. If the fair trial rights in the

### C.    Flaws in the SJC's analysis and conclusion.

The SJC's analysis and conclusion, using the broad-brush joint venture approach to negate any help which might flow to John from Hawkins, elevates theory over the reality existing in that particular courtroom. Although the Commonwealth gave lip service to a joint venture theory, the manner in which it tried the case, and the overwhelming emphasis of its closing was designed to convince the jury that this was a two-gun-two-shooter case, that there was no question that Jimmy fired one gun at the scene of the crime, and that John was the other shooter. (Tinsley's inclusion as a defendant was based only on evidence of his presence with the others going to the crime scene, at the crime scene, and leaving the crime scene; Brown's inclusion was based on the same factors as Tinsley's, with the addition that he was alleged to have "fingered" the victim.) It is implausible that this particular jury, on the state of the evidence enhanced by the prosecutor's argument, could have believed that the idea the Commonwealth was selling them was that John was a mere joint venturer, i. e., that he was merely present with the group and then acted as a getaway driver. Any rational juror, rather, would believe that the only idea the Commonwealth was selling was that John was the other shooter. Evidence taking the gun out of John's hands at Walaikum's and putting it in Tinsley's would have raised reasonable

---

Sixth Amendment had any goal, it was to ensure to the accused at least the rights of the prosecution as a minimum.

doubt as to the murder and gun-related charges against John arising out of the shooting at Walaikum's.

### E.    The thrust of the Compulsory Process Clause cases.

The thrust of the Court's opinions is that the pathway to the closest we mortals can come to the truth is by way of fair process. An accused should have the opportunity to present his evidence even though it may not appear at first blush credible to the trial judge. The Court's opinions do not depend on whether the contents of the proposed evidence were reliable or trustworthy, especially in *Crane v. Kentucky*, where an accused's testimony is usually considered self-serving and suspect, and in *Washington v. Texas*, because his co-defendant's testimony under circumstances where he had already been convicted of the murder would likewise be suspect.

Where there was an objection on a matter involving petitioner's constitutional rights, the Commonwealth bears the burden to show that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). The Commonwealth cannot meet that burden.

**GROUND TWO.**
**WHEN THE TRIAL JUDGE, AFTER THE VOIR DIRE OF A PROSECUTION WITNESS THAT MADE IT CLEAR THAT THE WITNESS (MARVETTE NEAL) WOULD GIVE THE JURY TESTIMONY OF NO EVIDENTIARY VALUE ABOUT THE COMMISSION OF THE CRIME, STILL PERMITTED THE WITNESS TO TESTIFY OVER OBJECTION, SUCH RULING VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.**

### A.    The fundamentally unfair and inconsistent rulings on Hawkins and Neal.

The compulsory process right to present a defense and the right of confrontation, along with the other rights enumerated in the Sixth Amendment, are stated as rights of the accused "in all criminal prosecutions." The right to present a defense by eliciting facts favorable to the accused, and the right of confrontation by discrediting the prosecution's case are the interrelated parts of a complete defense, using different means for achieving the same goal: to raise reasonable doubt about the accused's guilt in the minds of the jurors. So the right to confront and discredit (impeach) is stated in terms of the petitioner having the right, and not the prosecutor. As regards the Marvette Neal controversy, the prosecutor used subterfuge and was erroneously permitted to appropriate that right.

If the state court may exclude Hawkins' from testifying, after a showing that he could give some valuable evidence in petitioner's favor, and thereby also deny petitioner the opportunity to call Detective O'Leary to the stand to impeach Hawkins on other details, the court should have also excluded Neal from testifying, after he had already shown that he would not give testimony of any evidentiary value, thus denying the prosecution the opportunity to call Detective Dorch to "impeach" Neal. On the other hand, if the state court may permit the Neal-Dorch subterfuge to take place, it should also have allowed Hawkins to testify subject to cross-examination, jury instructions, corroboration,

impeachment, and the like.

**B.    The Dorch report.**

The February 10, 1995 report by Detective Dorch (Dorch report) of his interview with Neal indicates that: Neal was in Walaikum's at the time of the shooting; he saw the two Evans brothers there, both of whom he had known for some time; "Marquis" (street name for Jimmy) first stared, and then ratcheted a silver handgun and fired approximately five shots at the victim; "Marquis" left the store and "Tiny" (street name for John) came into the store and fired 3-4 shots at the victim.

**C.    Neal's grand jury testimony.**

In his February 16, 1995 testimony before the grand jury, Neal did not remember "Marquis" staring at the victim, or taking out a silver handgun, or exactly what he told police. He remembered someone getting shot, not who shot him. He merely identified "Marquis" and "Tiny" as knowing them and "saying that they were at the place where the murders take [sic] place". [A. 87-92] He was on the floor when the shooting happened, and did not remember telling the police that the Evans brothers were responsible for the shooting. [A. 88-95]

**D.    Neal's voir dire at trial.**

Even after Holliday testified that he did not see Neal, whom he knew, inside Walaikum's during the shooting incident [3/63], the prosecutor wanted the problematic Neal to testify. [4/81-84,160] Neal did not remember: telling the police that "Marquis" stared at the victim,

ratcheted a gun, fired approximately five shots at the victim, or that
"Tiny" came in and fired three to four shots at the victim [4/167-168]. He
denied: seeing the shooting and telling officers that he saw the shooters
[4/169]; selecting John as the second shooter; identifying Jimmy as the
first shooter. He then explained that, "I was asked if I saw [John and
Jimmy] in the [photo array] and that's how I identified them, as knowing
they were," and that is why his signatures appeared on the two photo
arrays. [4/170-171]

> ### E.    Neal's testimony: "no evidentiary value."

It was clear by this time that Neal would give the jury no probative
evidence about the shooting at Walaikum's. Yet, with this foreknowledge,
after a side bar conference and over objections, the prosecutor was
permitted to ask Neal questions about his interview by Detective Dorch.
After Neal testified in keeping with his voir dire testimony, including
denial of his signing the photo arrays [4/187-195], the court instructed
the jury that all of this had no evidentiary value. [4/195] But this
permitted attorneys for Brown [4/199], and Tinsley [4/210] to exacerbate
the damage to John.

> ### F.    Dorch's trial testimony: received only as "impeachment"
> of Neal's testimony.

Detective Dorch, over objections, but along with limiting
instructions that his testimony was not substantive evidence, was
permitted to testify as to what Neal purportedly told him about the
shooting at Walaikum's. [5/9-17] The court further instructed that

23

Dorch's testimony was "offered as impeachment of Mr. Neal's testimony ... and not as substantive evidence." [5/17] Dorch, over objection, then told the jury that Neal identified John and Jimmy from the photo arrays as being the shooters, and that Neal signed each array. The arrays were then marked as exhibits. [5/19-25] Brown's counsel led Dorch over the details of his report several more times. [5/26-36]

### G.    Neal's grand jury statements admitted as "substantive evidence."

The only "substantive evidence" the judge attributed to Neal came from his grand jury testimony: first during Neal's direct examination [4/175-186], when the judge stated in open court, "Okay. That's past recollection recorded." Then, over objections, the grand jury court reporter read five questions and answers to the jury, to this effect: Neal knew John and Jimmy, and saw them in the store; he identified their photos "as knowing them and saying they were at the place where the murder[] [took] place;" and he saw them at Cortees. [7/19-27] The prosecutor should not have been permitted to use Neal's purported statements to the police or to use his grand jury testimony.

### H.    Impeachment: when proper and when subterfuge.

The purpose of impeachment is to discredit a witness who gives probative evidence against the party impeaching him. P. J. Liacos, *Handbook of Massachusetts Evidence* (Brodin & Avery, eds., 6th ed., 1994) at 264. As to a party's own witness, "[t]he maximum legitimate

effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised." *United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1994) (citations omitted). The prosecutor knew that Neal would give no probative evidence against the Commonwealth that needed "cancellation." Placing Neal on the stand in order to later impeach him by hearsay evidence violates the above principles, and the principle stated in *Commonwealth v. Benoit*, 32 Mass. App. Ct. 111, 114-117, 586 N.E.2d 19 (1992), and authorities cited therein as to the nature of the error and the prejudice flowing therefrom. See, also, *Commonwealth v. McGee*, 42 Mass. App. Ct. 740, 745-746, 679 N.E.2d 609 (1997). Accord *Commonwealth v. Rosa*, 412 Mass. 147, 162-163, 587 N.E.2d 687 (1992) (citing federal cases invoking due process concerns offensive to fundamental fairness when testimony elicited at trial with intent simply to provide foundation for impeachment by prior inconsistent statement).

The Commonwealth's closing is telling as to its use of Neal: Neal "places the two Evans brothers in Walaikum's. He places them up at Cortees." [10/137-138] The prosecutor spoke of Neal's purported statements to Detective Dorch, as compared to his in-court testimony, in a disparaging and discrediting way, but nothing Neal said needed discrediting. Mentioning Dorch's testimony as to what Neal purportedly told Dorch was the prosecutor's invitation to the jury to accept Dorch's words as substantive, judge's instructions notwithstanding, a warned-

against result in *Commonwealth v. Benoit, supra,* 32 Mass. App. Ct. 117,
586 N.E.2d 23. The judge's later instructions would not rectify the error.
"[A]sking the jury to [limit its use of the evidence once they have heard it]
may be tantamount to asking the jury to ignore that an elephant has
walked through the jury box." *Commonwealth v. Flebotte*, 34 Mass. App.
Ct. 676, 680 (1993), S.C. 417 Mass. 348, 630 N.E.2d 265 (1994). Justice
Jackson, in his concurring opinion in *Krulewitch v. United States*, 336
U.S. 440, 453 (1949), said that: "The naive assumption that prejudicial
effects can be overcome by instructions to the jury ... all practicing
lawyers know to be unmitigated fiction."

Dorch's recitation of Neal's statements, the only statements
attributed to someone who knew John, positively naming him as a
shooter in Walaikum's, was the "elephant" that the jury was asked to

ignore.[7] In *United States v. Gomez-Gallardo, supra,* a witness testified the same way in front of jury as he did in voir dire and, although there was no objection, the reviewing court found "plain error" for the use of impeachment when "employed as a guise for submitting to the jury substantive evidence that is otherwise unavailable." *Id.,* 915 F.2d 555-556, n.5. The evidence against John from other sources was not overwhelming. We cannot say with fair assurance that the trial judge's handling of the Neal-Dorch report situation did not have a significant impact on the jury's decision.

Neal's grand jury five questions and answers were inadmissible. In *Commonwealth v. Daye,* 393 Mass. 55, 469 N.E.2d 483 (1984), the SJC set these limits: "a prior inconsistent statement is admissible as probative if made under oath before a grand jury, <u>provided the witness can be effectively cross-examined as to the accuracy of the statement</u> ...."*Id.* 74 (emphasis supplied). Here, Neal did not remember: seeing the Evans brothers at Cortees or telling that to the grand jury [*4/175-176,180*]; seeing the Evans brothers inside Walaikum's or telling that to the grand jury. [*4/181-182, 184*] The petitioner, therefore, could not effectively cross-examine Neal as to the accuracy of those statements read to the jury because Neal had no memory of making them and did not remember the facts underlying the statements. "Where a witness has

---

[7] Clarke's testimony about gunman # 1 might apply to John, but he stated that gunman # 1 fired first and had a chrome/silver gun; Holliday said that Jimmy had the chrome/silver gun (he ran out and did not see anything else); and Neal's "statement" in the Dorch report was that Jimmy had the chrome/silver gun and fired first.

no present memory as to the substance of the prior statement, its admissibility is generally precluded because opposing counsel would not have an opportunity for meaningful cross-examination of the witness at trial." *Commonwealth v. Martin*, 417 Mass. 187, 197, 629 N.E.2d 297 (1994). A meaningful and effective cross examination is required by the Sixth and Fourteenth Amendments to the United States Constitution. *Commonwealth v. Michel*, 367 Mass. 454, 459-460, 327 N.E.2d 720 (1975); *Commonwealth v. Johnson*, 365 Mass. 534, 543-544, 313 N.E.2d 571 (1974). The SJC acknowledged that Neal's grand jury testimony was not admissible under any theory, but "saved" the error by deeming it "cumulative." *Commonwealth v. Evans*, 439 Mass. 184, 190-191, 786 N.E.2d 384. Where there was an objection on a matter involving petitioner's constitutional rights, the Commonwealth bears the burden to show that the error was harmless beyond a reasonable doubt. *Chapman v. California, supra,* 386 U.S. 24. The Commonwealth cannot do so.

## I.   The SJC's flawed rulings concerning impeachment of Marvette Neal.

The SJC focused on the incorrect point in time for deciding the *Benoit*-subterfuge issue. The cases and authorities discussed and relied upon in *Benoit* and others cited herein focus on the judge's consideration of an objection by the defendant at the time the witness is under oath on direct before the jury, and not at some later time. The correct time in this instance is at the end of a side-bar conference while Neal was still on

28

direct. [*4/ 190-193*] By that time, there could have been no reasonable expectations by the prosecutor, the defense lawyers, or the judge that Neal would admit making the particularized statements attributed to him in the Dorch report, and no reasonable expectations that his testimony would have any evidentiary value, so that the proposed line of questioning only would be a *Benoit*-type subterfuge for otherwise inadmissible testimony given later by Detective Dorch. It should have ended there. Instead, Neal was allowed over objection to be questioned about events of the shooting which would produce testimony of no evidentiary value, and then Dorch was allowed to "impeach' Neal.

While acknowledging the "guise" for allowing Neal to testify over objection,[8] the SJC "saved" the resulting prejudice by focusing on defense counsels' (John's and Jimmy's) questions to Neal on <u>cross-examination</u>. This puts the cart before the horse. Each counsel was placed in a zealous advocate's quandary. Counsel could not ignore the "elephant" that got into the jury box. Each of them tried to mitigate the damage resulting from the judge's erroneous ruling permitting Neal to continue to testify on direct. What other undue damage happened after this erroneous ruling? During his cross-examination by Brown's counsel, Neal blurted out that he had been arrested and brought in, which led to the jury being exposed to his having to be arrested "to insure [his] appearance" to testify. [*4/204-205*] Counsel for Tinsley later got Neal to

---

[8] *Evans*, 439 Mass. 192, 786 N.E.2d 384.

admit that he was "not real happy to be here today" and that "it took some assistance to get [him] here today." [4/211]

The prosecution completed the goal of its subterfuge when it called Dorch to the stand. Dorch was permitted, over objection, to tell the jury that Neal identified John and Jimmy from the photo arrays as being the shooters, and that Neal signed each array. The arrays were then marked as exhibits and published to the jury. [5/19-25] Counsel for Brown later led Dorch over the details of Neal's alleged prior statements several more times. [5/26-36] All of this damage should be considered in terms equivalent to the "fruit of the poisonous tree" principle. It was fundamentally unfair and a denial of due process to allow the prosecutor to use Neal as a subterfuge. It is analogous to the knowing use of false testimony, see e. g., *Giglio v. United States*, 405 U.S. 150 (1972) and *Brown v. Wainwright*, 785 F.2d 1457, 1464 (11th Cir. 1986), or the knowing use of false evidence, see *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

**GROUND THREE.**
**WHEN THE TRIAL JUDGE, WHO IN THE ABSENCE OF *VAN ARDSALL* CONCERNS, FORBADE ACCUSED FROM USING, IN CROSS-EXAMINATION OF A KEY PROSECUTION WITNESS, THE ACTUAL NAMES OF THE UNRELATED CHARGES – RAPE, KIDNAPPING, AND ASSAULT AND BATTERY WITH DANGEROUS WEAPON – THEN PENDING AGAINST THE WITNESS IN THE SAME COUNTY, AND ONLY PERMITTED REFERENCES TO THEM AS "SERIOUS CHARGES, SUCH RULING VIOLATED THE ACCUSED'S SIXTH AMENDMENT CONFRONTATION CLAUSE RIGHT TO SHOW WITNESS BIAS.**

**A.    Petitioner's need and right to show bias.**

Alton Clarke was a key Commonwealth witness.[9] The prosecutor tried to protect him. He told the judge that Clarke was "facing very serious matters of rape amongst other charges," and asked "that counsel not be allowed to probe in those areas." [6/73-74] Defense counsel, to show bias, wanted to mention the specific names of the charges -- aggravated rape, kidnapping, and assault and battery, dangerous weapon. [A. 113] Over objections, the judge forbade references to the specific names of the pending charges. He ordered that defense counsel refer to them merely as "serious pending matters" [6/73-78], or "serious felony charges." [6/100-101]

Where, over multiple objections, the trial judge barred defense counsel from naming the specific charges facing a key prosecution witness, he interfered with petitioner's constitutional cross-examination rights to show bias. The Sixth and Fourteenth Amendments to the United States Constitution give the accused rights to effective cross-examination of such a witness. *Commonwealth v. Michel, supra,* 367 Mass. 459-460, 327 N.E.2d 720, *Commonwealth v. Johnson, supra,* 365 Mass. 543-544, 313 N.E.2d 571, each citing Massachusetts and federal court cases on cognate constitutional rights. John's right to confront witnesses against him and his right to due process apply here. *Ids.*

---

[9] He was the only witness who claimed to have seen: (a) two gunmen in Walaikum's, one firing at the victim; (b) the gunmen getting into the Lexus after the shooting and taking certain seats there; and (c) gunman # 1 still occupying the driver's seat when he saw the Lexus going by near his house. His testimony was not cumulative.

31

"Evidence tending to show that an important government witness is biased is exculpatory within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963)." *Commonwealth v. Jackson,* 388 Mass. 98, 112, 445 N.E.2d 1033 (1983).

Under the analysis of *Davis v. Alaska*, 415 U. S. 308, 317-320 (1974), the constitutional right to effective cross-examination to uncover the bias of an adverse witness is "<u>so vital</u>." *Id.* (emphasis supplied). Clarke's testimony provided a "crucial link in the proof of [John's] act" *id.,* and John needed to effectively explore why Clarke might be biased from which to argue from the record. Naming the specific names of the pending charges was the only fair way to explore why "[Clarke] might have been biased or otherwise lacked that degree of impartiality expected of a witness at a trial" *id.,* particularly Clarke's reason to come forward late, and his reason to hope for favorable treatment.

Where the accused needed to show the nature and extent of the bias of a witness like Clarke, ordering the use of ineffective vague words like "serious charges" in place of the specific names of the charges improperly impeded petitioner's confrontation right. Although the dictionary meaning of the word, "serious" conveys a sense of gravity or importance, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3rd ed., 1996) at 1648, what is grave or important to some people may be of much less gravity or importance to others. The jury might not appreciate exactly what was at stake for Clarke as a reason for

giving his testimony, given the date he first came forward and gave a statement to the police. He called 911 a few minutes after the January 25, 1995 Walaikum's shooting, but only reported it and did not give his name. On May 4, 1995, the aggravated rape, kidnapping, and assault and battery, dangerous weapon indictments were returned by a grand jury and filed against him in the Suffolk Superior Court, but only in October 1995 did he "come forward" to the police and give a statement in the instant case. [*6/73-77, 96-100*]

To lay jurors, charges of such significantly lower magnitude as operating under the influence of liquor or driving to endanger might be "serious." *Commonwealth v. Pappas,* 384 Mass. 428, 432, 425 N.E.2d 323 (1981); *Commonwealth v. Stracuzzi,* 30 Mass. App. Ct. 161, 566 N.E.2d 1151 (1991). But the words, "aggravated rape", "assault and battery with a dangerous weapon", and "kidnapping" would necessarily merit their attention and heightened scrutiny on the question of Clarke's bias, whereas the words, "serious charges" might not. The question of bias, therefore, was not fairly and sufficiently aired, because the use of the specific names "would register quite a bit higher on [the influence to prevaricate] meter." *Commonwealth v. Piedra,* 20 Mass. App. Ct. 155, 156, 478 N.E.2d 1284 (1985); *Commonwealth v. Lewis,* 12 Mass. App. Ct. 562, 572-573 & n.20, 427 N.E.2d 934 (1981) and cases cited (jurors should know nature of pending charges so that they will have some means of gauging extent to which witness may be biased). (Emphasis

33

supplied.)

On balancing the rights of those involved, John as an accused in a murder trial needed to use the specific names of the charges for his defense; Clarke would not have been prejudiced merely by the use of specific charge names, already on record and the subject of public bail hearings. With no need to go into the details or merits of the charges, there would be no impingement on Clarke's Fifth Amendment or cognate rights under art. 12 of the Massachusetts Declaration of Rights. As between the rights of John and the Commonwealth, the Commonwealth knew that such an important witness would be subject to cross-examination on reasons for giving the evidence, such as bias, and would not have been prejudiced by the use of a few words needed to protect against loss of John's life-long liberty. The use of the few more words would not have been cumulative on Clarke's bias, and would not have lengthened the trial or have caused any undue hardship on the Commonwealth. John, however, could not have presented the very probative, precise information on Clarke's bias in any other way. Other reasons for a trial judge to exercise discretion on limiting cross-examination, "harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant[,]" *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), are also not present here.

Partial airing of the bias question is not enough when it applies to

a key witness. Even though the judge, in *Commonwealth v. Connor*, 392

Mass. 838, 467 N.E.2d 1340 (1984), permitted extensive cross-

examination of a key witness to impeach her testimony by showing prior

convictions and possible bias stemming from past benefits received

under a federal witness protection program, he committed reversible

error in refusing to allow adequate cross-examination concerning the

witness' then pending criminal charges. The SJC stated,

> the pendency of criminal charges might have inspired hope of
> lenity and fear of punishment if such lenity were not obtained. As a
> source of human motivation, gratitude pales beside hope and fear.
> In the circumstances, [petitioner] was entitled to the inquiry he
> sought. The judge's restriction of the cross-examination of [Clarke]
> was erroneous. Because of this error, the [petitioner] was limited in
> arguing the witness's motive to lie. The prosecutor, on the other
> hand, relied on [Clarke's] testimony in his summation and
> emphasized [Clarke's] lack of any motive to lie. Because the
> erroneous ruling tended to bolster the credibility of the
> Commonwealth's witnesses and to impair the[petitioner's] attack
> thereon, we cannot say that the error was harmless. Reversal is,
> therefore, required. *Id.* 842-842.

Accord *Commonwealth v. [Dauntel] Evans*, 512 A.2d 626, 628-633 (Pa.

1986) (analysis under Sixth Amendment to United States Constitution

and cognate provision under Pennsylvania Constitution, *id.* n.2). "The

reliability and credibility of [Clarke] was essential to the proof of the

defendant's guilt, and refusal to allow cross-examination designed to

show that his motive for testifying was [to obtain leniency on the

aggravated rape and other charges then pending against him] was a

serious error which requires a new trial." *Commonwealth v. Graziano*,

368 Mass. 325, 330, 331 N.E.2d 808 (1975).

**B.    The SJC's flawed reasoning.**

Clarke, a key Commonwealth witness, could have been biased because of fears over his pending charges at the time he was testifying, notwithstanding his denials and the Commonwealth's claims of "no deal." The SJC's references to Clarke's subsequent trial, conviction and appeal misapprehend the point and are irrelevant to the judge's ruling at trial. The issue is the effect of John's argument during the closing on the bias of such a key witness, had he been able to use the more powerful specific names of the charges. The question and argument to the jury is whether Clarke, at the moment he was testifying, had harbored hopes of receiving lenient treatment on those specific charges if he testified favorably for the Commonwealth. Partial airing of this question is not enough for this key witness. The evidence against John from other sources was not overwhelming. "Serious damage to the strength of the State's case would have been a real possibility had ... [the petitioner] been allowed to pursue this line of inquiry." *Commonwealth v. Franklin*, 366 Mass. 284, 290, 318 N.E.2d 469 (1974), quoting *Davis v. Alaska*, 415 U.S. 308, 319 (1974).

The SJC misapprehended what the trial judge did on this issue. He did not exercise discretion at all. Judicial discretion is defined as the "exercise of judgment by a judge or a court based on what is fair under the circumstances and guided by the rules and principles of law ...." BLACK'S LAW DICTIONARY (deluxe; 7th ed. 1999) at 479 (emphasis

36

supplied). The SJC has not articulated any rule or principle of law applicable to this case sufficient to warrant bringing the use of discretion to bear on limiting John's cross-examination of Clarke, other than to say merely that the judge may exercise discretion to do so. But activating a latent power to exercise discretion, in the absence of a legitimate *Van Ardsall* type of concern, violates petitioner's cross-examination rights. Furthermore, "[a]n adjudicator's failure to exercise sound, reasonable and legal decision-making is an abuse of discretion." BLACK'S LAW DICTIONARY, *supra,* at 10.

When an accused, like John, starts out with constitutional rights to present a defense either by presenting evidence of his own, or by cross-examining the prosecution's witness to show bias, he should not be limited unless there is a sufficient legitimate state interest to act as a counterweight against those rights. *Rock v. Arkansas,* 483 U.S. 44, 55 (1987); *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986). Such legitimate counterweights (reasons to exclude cross-examination questions) are set forth in *Van Ardsall* The trial judge may be permitted to exercise his discretion only when presented with such a counterweight. Neither the trial judge nor the SJC has articulated a legitimate state interest as a reason to exclude the naming of Clarke's pending charges in John's cross-examination. That exclusion unduly thwarted John's need and right to bring out the "nature of the unresolved charges pending against the witness so that [the jury] have

some means of gauging the extent to which the witness may be biased."

*Commonwealth v. Lewis, supra,* 12 Mass. App. Ct. 573, n.20, 427 N.E.2d

934. Restrictions on John's cross-examination rights without a legitimate

reason are arbitrary, *Rock v. Arkansas, supra,* 483 U.S. 56, and thus are

abuses of discretion requiring reversal.

Where there was an objection on a matter involving petitioner's

above-mentioned constitutional rights, the Commonwealth bears the

burden to show that the error was harmless beyond a reasonable doubt.

*Chapman v. California, supra,* 386 U.S. 24. The Commonwealth cannot

do this under the state of the evidence.

### GROUND FOUR.
**PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF
COUNSEL WHEN HIS COUNSEL FAILED TO SEEK SEVERANCE
SO THAT PETITIONER COULD HAVE OBTAINED
EXCULPATORY EVIDENCE FROM CO-DEFENDANT ROBERT
BROWN III AS WELL AS OTHER EVIDENCE FROM BROWN
WHICH WOULD HAVE SUBSTANTIALLY STRENGTHENED HIS
CASE.**

### A.    The nature of Brown's evidence.

Brown's evidence was unavailable to John because he was tried

with John, and he used his constitutional right not to testify. John had

no constitutional right or subpoena power to have access to Brown's

testimony. *Commonwealth v. Gagnon,* 408 Mass. 185, 194-198, 557

N.E.2d 728 (1990), and cases cited; *Commonwealth v. Slonka,* 42 Mass.

App. Ct. 760, 769, 680 N.E.2d 103 (1997).[10] Brown would have testified for petitioner had he been tried first and separately. [A.106, 109-110, 130, 251]

Brown's evidence would have bolstered John's on three points: (1) John's location and doings outside Walaikum's, negating John's knowledge, presence and participation as to what happened inside Walaikum's; (2) later talk in the car about Jimmy and Tinsley having guns and John's stopping the car, negating John's having had prior knowledge of another person's possession of a gun or intention to use a gun inside Walaikum's; and (3) Tinsley's self-incriminating statements, once, while in the car soon after the shooting, and at two other times about which the jury did not hear, one later that same morning, and another while awaiting trial. [A.107-109] Brown's evidence strongly suggests that Tinsley was the only shooter and corroborates John on this point as well as in points 1 and 2. Brown has other information the jury did not have: he locates on a color photo the approximate spots where the car was parked, marked, "L," and where he went, marked, "B." [A.108, 112] Brown's trial attorney, Mr. Sheketoff, affirms that Brown's testimony is wholly consistent with Brown's position right from the beginning, and further affirms that he advised Brown not to testify at the trial, but would have allowed Brown to testify for John had Brown been

---

[10] Cf. *Commonwealth v. Babbitt*, 430 Mass. 700, 707 n.6, 723 N.E.2d 17 (2000) (probable that co-defendant unavailable, as he would likely invoke right against self-incrimination at defendant's trial).

tried first and separately. [A.106-108, 201] The current unavailability of affidavits from Brown and Mr. Sheketoff are also explained. *Id.*[11]

As to Brown's credibility, see *Commonwealth v. Grace*, 397 Mass. 303, 311-312, 491 N.E.2d 246 (post trial confession of defendant's brother, Ross, was not "so devoid of credibility as to render it unworthy of all belief"). Brown, on the other hand, does not even have Ross Grace's impairments: he is not John's brother, did not testify at trial, has no prior testimony to recant, and is not giving evidence at this time in order to help himself. On being booked, he was the only one to give his true name. [5/218, 229-230, 232, 238][12] Brown's evidence would probably have been a real factor in the jury's deliberations, carries a measure of strength in support of defendant's position, and casts real doubt on the justice of the conviction.

## B.    Brown's evidence is material and exculpatory.

Brown's evidence is material and exculpatory because, when it is "evaluated in the context of the entire record, [the evidence] creates a reasonable doubt that did not otherwise exist." *Commonwealth v. Vieira*, 401 Mass. 828, 832-833, 519 N.E.2d 1320 (1988). See discussion in

---

[11] Brown was not, and could not be for reasons given, listed as an alibi witness. Before trial, also for reasons given, any attempt to preserve testimony would have been futile. If subpoenaed now, he would give evidence tending to exculpate John. Post-trial, John requested leave to issue a deposition subpoena in order to depose Brown under oath, the first seeking funds and the second with funds in-hand, but the state courts denied him the opportunity to do so.

[12] As to testimony from a person who has been convicted of a crime, see *United States v. Burns*, 898 F. 2d 819 (1990) (government cannot complain against defendant's proposed use of co-defendant's testimony to corroborate his position and help exculpate him; court recognizes that government uses admittedly guilty co-defendants every day, while claiming that they are "useful—even vital ... "). *Id.* 821.

*Arizona v. Fulminante*, 499 U.S. 279, 297-300 (1991) (in assessing impact and credibility of one witness's testimony, testimony by a second witness tends to make the less believable testimony of first witness more believable). This would make more believable John's testimony, if it came after Brown's, keeping in mind that the only non-defendant witness whose testimony tended to show that John was not in Walaikum's that night was Mr. Wiggins. *Commonwealth v. Bennett,* 43 Mass. App. Ct. 154, 157-162, 682 N.E.2d 648 (1997), and authorities cited therein, recognize the role of the jury in determining the importance of the newly available evidence against claims that it might be cumulative.

### C.    John's counsel was ineffective in failing to seek severance.

Petitioner's counsel failed to seek severance so that Brown could provide exculpatory and material evidence for John.

As shown above, counsel had a basis to move for severance that would have outweighed reasons for joinder. This loss of use of Brown's evidence impinged defendant's fundamental right "to present ... his version of the facts," *Washington v. Texas, supra.,* 388 U.S. 19, *Chambers v. Mississippi, supra.,* 410 U.S. 302-303, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

Had counsel timely moved, pursuant to Mass. R. Cr. P. 9(d), for severance on this basis, the motion would likely have been allowed by a fair minded judge under the requirements and test in *United States v.*

*Drougas*, 748 F. 2d 8 (1st. Cir. 1984).

> In order to be entitled to a severance on the basis of a codefendant's testimony the movant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed [*Drougas* requirements]. Given such a showing, the court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy;  and (4) give weight to the timeliness of the motion [*Drougas* test]." Id. 19, as quoted in *United States v. Burns, supra.*, 898 F. 2d 820 (citations omitted).

Petitioner would have met the initial *Drougas* requirements as shown in

the discussion thus far.[13] With this showing made, there is substantial

support for severance to avoid depriving petitioner of Brown's

exculpatory evidence. See, also, K. Smith, *Massachusetts Practice,*

*Criminal Practice and Procedure* (2d. ed., 1983 and 1997 supple.) §1063.

Although Brown would not have been John's only witness (as Jay

was in *United States v. Burns* ), he was the only one corroborating and

supporting John and his theory in defense in the three important

respects discussed above: (1) John's location <u>outside</u> Walaikum's at all

times; (2) talk in the car after the shooting showing his lack of prior

knowledge of others having guns; and (3) Tinsley's three self-

---

[13] Severance should be granted under Mass.R.Crim.P.9(d) if the defendant can show that (1) the co-defendant will testify only if the trials are severed, (2) the testimony will be exculpatory, and (3) he has substantial need for the testimony. See *Commonwealth v. Beneficial Finance Co.*, 360 Mass. 188, 222, 275 N.E.2d 33 (1971). There, the court, while not reversing for failure to sever, cited federal cases that enumerated these factors. *Commonwealth v. Barrett*, 6 Mass. App. Ct., 952, 953, 383 N.E.2d 96 (1978) (rescript) and *Commonwealth v. Burke*, 20 Mass. App. Ct. 489, 510-511, 481 N.E.2d 494 (1985) also used these factors. As the discussion shows, defendant satisfies these factors.

incriminating statements. The foregoing shows not only the need, substance, exculpatory nature and effect to satisfy the initial *Drougas* requirements, it also satisfies the first part of the *Drougas* test.

As to timeliness, the case was tried about 22 months after the incident. The docket entries suggest that all discovery and investigation would have been complete well before then, including discovery of Clarke's October 1995 statement. This is supported by inspection of trial counsel's files. [A.110] Petitioner would have waived his speedy trial rights in order to obtain Brown's testimony. [A.131] Counsel would have had ample time to have learned the nature of the evidence against and for John, and to have sought severance well before trial started. [A.129-131] Here, neither judicial economy nor public interest in speedy trials outweighs the need for severance. John should not be penalized or faulted for his counsel's failing in this regard. As the foregoing discussion shows, John has been prejudiced by not having the use of Brown's exculpatory evidence which could have been obtained had counsel timely move for severance. Granting of severance in these circumstances would have been well within the discretionary powers of the trial judge where such fundamental rights are involved.

Counsel's strategy to blame Tinsley, but not to seek a severance so that John could be tried separately from Brown and Tinsley, was manifestly unreasonable. Counsel's tactical reason for not doing so was that he wanted Tinsley in the same courtroom with John while he was

pointing the finger of blame. [.254] Petitioner is aware of the appellate

opinions giving deference to reasonable strategy and tactics of trial

counsel. Here, petitioner has shown that "some other action would have

better protected [John] [] and was reasonably foreseeable as such before

trial." *Beasley v. United States*, 491 F. 2d 687, 696 (6th Cir. 1974).

Further on the question of foreseeability, an ordinary fallible lawyer also

would have known well before the trial that Mr. Giblin, Tinsley's counsel

would be very antagonistic to John, particularly, at trial. [A.130, 253][14]

As the above discussion shows, as in *Commonwealth v. Moran*, 387

Mass. 644, 442 N.E.2d 399 (1982), "it appeared likely from pretrial

discussions that [John and Tinsley] would attempt to escape conviction

by blaming the other ..." *Id.* 660.[15] Although this mutual antagonism,

alone, may not have warranted a request for severance, the virtually

certain manifestations and harm to John throughout the trial should

have given an ordinary fallible lawyer an additional reason for requesting

severance so that Brown could provide exculpatory evidence that would

have substantially strengthened John's case.

### D. Counsel's failure to seek severance meets the *Strickland* test.

---

[14] Mr. Giblin often pointed the finger of blame at John. [*3/20-21; 6/161-169; 8/173-174; 10/113-130*] Brown's counsel also weighed in against John, by getting Holliday to go over the shooting at Cortees [*3/123*], then by having Detective Dorch repeat Neal's alleged February 10, 1995 statements [*5/30-39*], and then in his closing. [*10/95*]

[15] In the closings, John's counsel suggests that John has some burden on the joint venture question, raises questions about John's credibility [*10/50*], and finally points the finger of blame on Tinsley. [*10/52, 61*] Tinsley's counsel not only points the finger of blame at John, but also argues for the credibility of the Commonwealth's witnesses. [*10/116-121, 125*]

Aside from unreasonably misreading the record, and basing its

conclusions thereon[16], the SJC's analysis of this issue was contrary to,

and an unreasonable application of, Supreme Court precedent as set

forth in *Strickland v. Washington,* (*Strickland*) 466 U.S. 668 (1984) and its

progeny. *Strickland* states the two-prong test under the Sixth and

Fourteenth Amendments to the United States Constitution. First

(performance), a "defendant must show that counsel's representation fell

below an objective standard of reasonableness," measured, in part,

according to prevailing professional norms. *Id.* 687-688. A "reasonably

competent attorney" performs "within the range of competence demanded

of attorneys in criminal cases," *United States v. Cronic,* 466 U.S. 648, 655

(1984), citing authorities. Second (prejudice), he "must show that there is

a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the

outcome." *Id.* 694. "The governing legal standard plays a critical role in

defining the question to be asked in assessing the prejudice from

counsel's errors. When a defendant challenges a conviction [on grounds

of ineffective assistance of counsel], the question is whether there is a

reasonable probability that, absent the errors, the factfinder would have

---

[16] This issue is congruent with the situation in *Washington v. Texas, supra,* where defendant wished to call a co-defendant who would have testified consistently with his defense. *Id.*, 388 U.S. at 16.

had a reasonable doubt respecting guilt." *Strickland, supra,* 466 U.S. 695. An ineffective assistance of counsel claim presents a mixed question of law and fact. *Id.,* 466 U.S. at 698. This court is not bound by the conclusions of the state courts that counsel rendered effective assistance. *Anderson v. Butler,* 858 F.2d 16, 18 (1st Cir.1988). "The *Strickland* principles for deciding ineffective assistance of counsel claims are 'clearly established' for purposes of the AEDPA." *Ouber v. Guarino* (*Ouber*), 293 F.3d 19, 26 (1st Cir. 2002).[17]

As regards a claim that evidence was not brought before the jury due to ineffective assistance of counsel, the opinion in (*Terry*) *Williams v. Taylor, supra,* involving a federal habeas corpus petition claiming ineffective assistance, sets further governing standards. It (1) cites A.B.A. standards for counsel's duty to investigate; (2) promotes the need to reweigh both evidence that came in at trial and evidence which did not, in order to determine what effect the latter evidence would have had on the trier of fact (here, as to whether the "factfinder would have had a reasonable doubt respecting guilt."), so that evidence which may sometimes be considered "cumulative" should still be used in the "reweighing" process; (3) mandates acceptance of the reality that, even if "not all of the additional evidence was favorable," evidence which would have helped petitioner should have been presented to the fact finder; and

---

[17] "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," thus limiting the utility of §2254(d)(2) on those topics. *Id* at 27, citing *Strickland,* 466 U.S. 698.

(4) does not accept a counsel's "tactical decision" in simply relying upon what was available to him without further investigation as representation within an objective standard of reasonableness. *Id.* 529 U.S. at 394-399.

The U.S. Supreme Court has decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S., at 690-691. In this vein, the SJC"s decision was contrary to, and an unreasonable application of Supreme Court precedent based on the foregoing discussion. In addition to the foregoing facts and argument, the SJC made unreasonable and unfounded presumptions/conclusions (see *Evans* at 439 Mass.197-198, 786 N.E.2d 388), as to, e.g., what counsel knew or could have known about such things as the content of Brown's testimony; the content of Willie Wiggins's testimony, the differences in kind, degree, and extent of the testimony from Brown, Wiggins, Jimmy, and the and likelihood of jury acceptance of testimony from each of them. In fact, petitioner raised an issue in his motion for new trial and in his appeal on improper prejudicial remarks in the prosecutor's closing argument, disparaging Willie Wiggins' evidence. The prosecutor argued, "You have the testimony of Willie Walaikum (sic) .... I was told the expected testimony was going to be, 'I know Randy Evans. He's a friend of mine, and he wasn't in the restaurant.'"[10/142] The prosecutor then went on to deride Mr. Wiggins' testimony. The SJC concluded that the remarks were fair comment,

because there was a disparity between Mr. Wiggin's evidence and the promise counsel made in <u>his</u> opening about this evidence. More timely investigation and preparation on the part of counsel would have revealed this disparity, and would have supplied another strong basis for seeking severance.

Evans Pet. Writ Habeas Corpus

48