# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10323-RWZ

**JOHN EVANS,**
       Petitioner

v.

**PAUL VERDINI, ET AL**
       Respondents.

## PETITIONER'S MEMORANDUM IN SUPPORT OF HIS PETITION FOR WRIT OF HABEAS CORPUS

Counsel for Petitioner:
Emanuel Howard, BBO No. 241740
P.O. Box 66067
Newton, MA 02466-0002
TEL. (617) 965-4042;  FAX (617) 965-3793

September 2004

## TABLE OF CONTENTS

STATEMENT OF THE CASE.................................................................1

STATEMENT OF THE FACTS...........................................................2

ARGUMENT..........................................................................................7

I. THE HABEAS CORPUS STANDARD.............................................7

II. INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD.................11

III. REASONS FOR GRANTING THE PETITION...................................14

Ground one: **WHEN THE MASSACHUSETTS COURTS ABSOLUTELY EXCLUDED POTENTIALLY EXCULPATORY EVIDENCE FROM EDDIE HAWKINS, A WITNESS CALLED BY PETITIONER, THEY VIOLATED HIS COMPULSORY PROCESS CLAUSE RIGHTS BY UNDULY ELEVATING COURT-MADE EVIDENCE RULES OVER THOSE RIGHTS, THUS MAKING THE SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE SUPERFLUOUS AS A TOOL OF A FAIR PROCESS**............14

    A.    **When the right to present a defense is involved, use of the adversarial system, rather than absolute exclusion, is the preferred means for dealing with possibly unreliable testimony**...................................................................14

    B.    **Petitioner's need for Eddie Hawkins' testimony**............15

    C.    **Flaws in the SJC's analysis and conclusion**....................18

    D.    **The thrust of the Compulsory Process Clause cases**......19

    E.    **Habeas relief is merited under the statute and the "harm" standard**...........................................................20

Ground two: **WHEN THE TRIAL JUDGE, AFTER THE VOIR DIRE OF A PROSECUTION WITNESS THAT MADE IT CLEAR THAT THE WITNESS (MARVETTE NEAL) WOULD GIVE THE JURY TESTIMONY OF NO EVIDENTIARY VALUE ABOUT THE COMMISSION OF THE CRIME, STILL PERMITTED THE WITNESS TO TESTIFY OVER OBJECTION, SUCH RULING VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS**.............................................20

    A.  **The fundamentally unfair and inconsistent rulings on Hawkins and Neal**................................................................20

**B.**   **The Dorch report.**...........................................................21

**C.**   **Neal's grand jury testimony.**...........................................22

**D.**   **Neal's voir dire at trial.**.................................................22

**E.**   **Neal's testimony: "no evidentiary value."**...................23

**F.**   **Dorch's trial testimony: received only as "impeachment" of Neal's testimony**......................................................23

**G.**   **Neal's grand jury statements admitted as "substantive evidence."**...........................................................24

**H.**   **Impeachment: when proper and when subterfuge**........24

**I.**   **The SJC's flawed rulings concerning impeachment of Marvette Neal.**............................................................27

**J.**   **Habeas relief is merited under any appropriate "harm" standard.**...................................................................29

**Ground three:** **WHEN THE TRIAL JUDGE, WHO IN THE ABSENCE OF *VAN ARSDALL* CONCERNS, FORBADE ACCUSED FROM USING, IN CROSS-EXAMINATION OF A KEY PROSECUTION WITNESS, THE ACTUAL NAMES OF THE UNRELATED CHARGES – RAPE, KIDNAPPING, AND ASSAULT AND BATTERY WITH DANGEROUS WEAPON – THEN PENDING AGAINST THE WITNESS IN THE SAME COUNTY, AND ONLY PERMITTED REFERENCES TO THEM AS "SERIOUS CHARGES, SUCH RULING VIOLATED THE ACCUSED'S SIXTH AMENDMENT CONFRONTATION CLAUSE RIGHT TO SHOW WITNESS BIAS.** ...........................................................32

**A.**   **Petitioner's need and right to show bias**....................32

**B.**   **The SJC's flawed reasoning.**.......................................37

**C.**   **Habeas relief is merited under the statute and the "harm" standard.**........................................................39

Ground four:  **PETITIONER WAS DEPRIVED OF EFFECTIVE
ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO SEEK
SEVERANCE SO THAT PETITIONER COULD HAVE OBTAINED
EXCULPATORY EVIDENCE FROM CO-DEFENDANT ROBERT BROWN
III AS WELL AS OTHER EVIDENCE FROM BROWN WHICH WOULD
HAVE SUBSTANTIALLY STRENGTHENED HIS CASE**......................40

    **A.**    **The nature of Brown's evidence**....................................40

    **B.**    **Brown's evidence is material and exculpatory**.............42

    **C.**    **John's counsel was ineffective in failing to seek
severance**....................................................................43

    **D.**    **Counsel's failure to seek severance would meet the
*Strickland* test on a more fully developed record**.........47

    **E.**    **Evidentiary hearing requested**......................................50

**CONCLUSION**...................................................................................52

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10323-RWZ

**JOHN EVANS,**
        Petitioner

v.

**PAUL VERDINI, ET AL**
        Respondents.

## PETITIONER'S MEMORANDUM IN SUPPORT OF HIS PETITION FOR WRIT OF HABEAS CORPUS

### STATEMENT OF THE CASE[1]

John Evans (John or petitioner ), Jimmy Evans (Jimmy), Ronald Tinsley (Tinsley), and Robert Brown III (Brown) were tried together before a jury in the Massachusetts Superior Court, Banks, J., for first-degree murder of Lyle Jackson [G. L. c. 265, § 1], and lesser charges connected with the same incident. John and Jimmy were convicted on all charges lodged against them; Tinsley was convicted only for possession of cocaine at the time he was arrested, and Brown was acquitted of all charges. John filed a timely notice of appeal. After undersigned post conviction counsel was assigned to represent him, petitioner moved for stay of

---

[1] Respondents purportedly supplied the court with copies of the state court materials in connection with its supplemental answer. Petitioner will herein refer to these materials as follows: those to the trial transcripts will be [volume number/page number]; those to the Appendix to petitioner's primary brief filed with the Massachusetts Supreme Judicial Court will be [A. number]; those to his primary brief will be [DB page number].

proceedings, and filed motions for new trial, for funds, and for other post-conviction relief. Those motions were denied. Notice of appeal was filed along with a request for consolidation. The Supreme Judicial Court of Massachusetts (SJC), on the consolidated appeals from the conviction and from the trial court's denial of the motions, affirmed. *Commonwealth v. Evans*, (*Evans*) 439 Mass. 184, 786 N.E.2d 375; rehearing denied (2003); *cert.* denied, 124 S.Ct. 323 (mem.) (2003).

Petitioner timely filed the instant petition.

## STATEMENT OF THE FACTS

### Commonwealth's evidence at trial.

The four co-defendants left Cortees, a bar on Washington Street, Dorchester [*3/168*], near its 2:A.M. closing time on January 25, 1995. From Cortees, the four went to "Conway's" in separate cars. There was talk about Jimmy and Tinsley wanting to get something to eat. They went in a Gold Lexus, John driving, to Walaikum's, a hamburger/sub shop in the Roxbury section of Boston, known to be open at that time. [*8/43-47*] Versions differ as to what happened after the four arrived there.

Marcello Holliday (Holliday), the victim's best friend [*3/27*], saw all four enter Walaikum's. He observed them whispering to each other regarding the victim, Brown saying, "that's him." Jimmy pulled a chrome handgun; Holliday immediately ran out of the shop and soon heard some gunshot sounds. He returned and saw the victim on the floor spitting up.

2

[*3/41-50, 61-62*] (The jury must have disbelieved Holliday's testimony of Brown's "fingering" the victim, because they acquitted Brown.)

Marvette Neal (Neal) did not remember, or denied having made, prior statements tending to inculpate John and Jimmy. It was made clear in his voir dire at trial, in the absence of the jury, that he would give testimony of no evidentiary value. But the Commonwealth, over objections, was permitted to examine him on direct, was permitted to use Neal's grand jury testimony, and later was permitted to use an investigating officer, to get those prior statements before the jury. [*4/174-198; 5/13-17, 19-25; 7/19-270*][2]

Alton Clarke (Clarke) was in Walaikum's, heard some "clicks," and saw gunman #1 walk in with a silver handgun. Gunman # 1 walked towards the then retreating victim. The victim fell while retreating; then gunman #1 shot the victim several times. Gunman #2 come in, pointed a black handgun at Clarke's chest, and then walked towards the victim. Clarke then backed out of the store, while hearing another shot, but did not see gunman # 2 shoot at the victim. The gunmen then came out and entered the Lexus, gunman # 1 into the driver's seat, and gunman # 2 into the front passenger seat. Clarke did not see the other two; he presumed that they were already in the car because he saw all four seats occupied as the Lexus drove by. Clarke called 911 merely to report the shooting and to give a license plate number for the Lexus, but he did not

---

[2] See ground two, *post* at 20.

leave his name. He saw that Lexus later, with the same four in the same positions, as it drove by on his street during a chase, by many police vehicles, then in progress. Clarke described the gunmen: gunman # 1, only as a black male with short hair, about 25-26 years old, 5'-9" to 5'-10", with a thick build; gunman # 2, only as black man, "much thinner," about 19 years old. He could not supply the names of the gunmen, could not point to anyone in the courtroom or in a photo array as being a gunman, and could not describe clothing worn by either gunman to any degree of certainty. [6/78-97] He was not even sure that gunman # 1 had a "low haircut." [6/135-136] The judge did not permit defense counsel during cross-examination to name the specific names of the aggravated rape, kidnapping, and assault and battery/dangerous weapon charges then pending against Clarke in an unrelated case in the same county.[3]

The car chase ended when the Lexus stopped in a cul-de-sac in Mattapan, another section of Boston. All four were arrested within seconds thereafter. The police recovered two 9mm. handguns seen being tossed out of the car during the chase: a black "H & K" and a silver "Ruger". [4/99-130] No fingerprint evidence tied John to either handgun. [6/51-73] A ballistician tied-in a spent bullet taken from the victim's body to the black H & K, and tied-in the silver Ruger to handgun projectile parts recovered both inside and outside Walaikum's, one of which came from the rug with blood on it. [7/28-83] There was blood on

---

[3] See ground three, *post* at 32.

4

Tinsley's outer garment. Tinsley and the victim had the same blood type, but the blood could have come from cuts Tinsley received as a result of the foot chase just before he was apprehended. [6/19-26, 34-37, 39-41] There was no evidence that any of the four co-defendants knew, or had any previous "problems" with, the victim.

**Defense case.**

John's testimony. Upon arrival near Walaikum's about 2:40 A.M., Jimmy and Tinsley left the car and walked towards the shop, and he saw Tinsley enter it. John never entered Walaikum's. Brown left the car and walked in the opposite direction to relieve himself down the street. John remained near the Lexus, moved to sit in the front passenger seat, and talked to three people he knew only by their first names: two men (Melvin and Daniel) and a woman (Tasha). [8/112] Within minutes, he heard sounds of gunshots coming from the direction of Walaikum's. People came out of the shop, and those on the street were running away. He moved to the driver's seat. Brown returned to the rear seat and told him to pull off, but he would not leave his brother. After Jimmy got into the front passenger seat and Tinsley got into the rear seat, he pulled off. After John pulled off, there was some discussion about guns other people had in the car. Before this, John did not know of anyone carrying a gun. He did not know anything more about the gun carrying. [8/43-67, 70-76, 111-114, 128-129] John did not know the victim, did not have a problem with him, nor did he say anything to the others about Mr. Jackson.

5

[8/81-82]

Jimmy's testimony. He testified that Tinsley entered Walaikum's first, and he entered behind Tinsley. Jimmy then went outside, and saw that John and Brown were "down by the car." Within two or three minutes, he heard gunshot sounds. Tinsley and others then came out of Walaikum's. Jimmy became fearful and drew a silver handgun for self-protection; the gun accidentally discharged three shots. John and Brown were already in the car when he and Tinsley entered it. Jimmy got into the front passenger seat, and Tinsley into right rear seat. Jimmy told John that he had a gun; John became upset. Jimmy threw his gun out of the car. There was no conversation among the four about the victim on the way to Walaikum's. [9/10-29] The silver handgun was Jimmy's. [9/33-34]

Willie Wiggins testimony. Mr. Wiggins, Walaikum's owner, was standing at the shop's counter facing the front door when a black man shot the victim. John's counsel, pointing to John, asked him: "Did you see that man in your restaurant the night that [the victim] got shot?" His answer was, "No, I didn't." [8/186-190]

John called Eddie Hawkins to the stand. He was expected to testify on incriminating statements Tinsley made to him. The statements also tended to exculpate John and support his defense. The trial judge

6

excluded the evidence. Neither Brown nor Tinsley testified.[4]

## ARGUMENT

### I.     THE HABEAS CORPUS STANDARD.

The standard for reviewing the instant petition for writ of habeas corpus is set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Because the petitioner is in state custody, his application for habeas review is controlled by 28 U.S.C. § 2254(d)(1). Within § 2254(d)(1), there are two categories of state court decisions that can qualify for the issuance of a writ of habeas corpus. "The first category embraces cases in which a state court decision directly contravenes Supreme Court precedent." *Williams v. Matesanz (Matesanz)*, 230 F.3d 421, 424 (1st Cir. 2000). A state court decision is contrary to clearly established Supreme Court precedent "if that decision applies a rule that contradicts a rule clearly articulated by the Supreme Court or if the state court confronts a set of facts that are materially indistinguishable from an earlier Supreme Court decision, yet arrives at a result that differs from that precedent." *Mastracchio v. Vose (Mastracchio)*, 274 F.3d 590, 597 (1st Cir. 2001).

The second category of state court decisions that can qualify under § 2254(d)(1) are those cases "in which a state court decision, although not 'contrary to' relevant Supreme Court precedent, nonetheless constitutes

---

[4] See ground one, *post* at 14 for more on the Hawkins exclusion, and ground four, *post* at 40 for more on the absence of Brown's evidence.

an 'unreasonable application' of relevant Supreme Court precedent."
*Matesanz,* 230 F.3d at 424. This can occur in a case where "a state court
correctly identifies the applicable federal rule but applies it in an
unreasonable manner to the facts of a particular case." *Id.* at 425; see
also *Mastracchio,* 274 F.3d at 597. This can also occur where "the state
court either unreasonably extends a legal principle from [Supreme Court]
precedent to a new context where it should not apply or unreasonably
refuses to extend that principle to a new context where it should apply."
*(Terry) Williams v. Taylor,* 529 U.S. 362, 407 (2000).

There is a third category of state court decisions that qualify for the
issuance of a writ of habeas corpus. That is, when a state court
adjudication "resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
court proceeding." 28 U.S.C. § 2252(d)(2).

On the issue of factual determinations, we must be careful to apply
them only in the proper fashion. "For this purpose, factual issues are
defined as basic, primary, or historical facts: facts in the sense of a
recital of external events and the credibility of their narrators. *Townsend
v. Sain,* 372 U.S. 293, 309 n. 6, 83 ... (1963) ...." (as quoted in *Bryson v.
Ward* 187 F.3d 1193, 1211(10th Cir. 1999) (internal citations and
quotation marks omitted); *Sanna v. DiPaolo (Sanna),* 265 F.3d. 1 (1st Cir.
2001) (same; "it would be wholly inappropriate for a federal court to
repastinate soil already thoroughly plowed and delve into the veracity of

8

the witnesses on habeas review."). *Id.* at 7, 10. See, also, *Wiggins v. Smith,* ___ U.S.___, 123 S.Ct. 2527, 2539 (2003) (factual error that "social service records ... recorded incidences of ... sexual abuse,"); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003) (discussion in terms of federal court's authority to disagree with a state court's credibility determination); *Norton v. Spencer* 351 F.3d 1, 6-7 (1st Cir. 2003) (similar, on credibility of affiants and factual determinations by state courts within the meaning of § 2254(e)(1)).

The standard for reasonableness is an objective one. The First Circuit set forth the current parameters of a standard for unreasonableness in *McCambridge v. Hall* (*McCambridge*), 303 F.3d 24 (1st Cir. 2002) (*en banc*), thereby, overruling the "outside the universe of plausible, credible outcomes" standard recited in *Matesanz, supra,* 230 F.3d at 425 and *O'Brien v. DuBois* (*O'Brien*), 145 F.3d 16, 25 (1st Cir. 1998). *McCambridge* at 37. The *McCambridge* Court placed the range for what is an unreasonable application somewhere between the "too severe" readings and the "too lenient," and concluded that "some increment beyond incorrectness is required[;] [t]he increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *Id.* at 36 (citations and internal quotation marks omitted). The Court left, intact, the example set forth in *O'Brien, supra,* 145 F.3d 25: that "the state court

9

decision may be unreasonable if it is devoid of record support for its conclusion or is arbitrary." *McCambridge* at 36-37.

A federal court can hardly defer to the state court on any constitutional issue that the state court did not address in that framework, so that the proper standard of review in that situation is de novo. *Watkins v. Murphy*, 292 F.3d 70, 75-76 (1st Cir. 2002).

Lastly, what is the general standard of harm? In *Brecht v. Abrahamson (Brecht)*, 507 U.S. 619, 637 (1993), the Supreme Court articulated a "less onerous" standard for assessing the impact of a state court's constitutional error on collateral review. Under *Brecht*, a federal court may grant habeas relief on account of constitutional error only if it determines that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *See id.* at 623 (quoting *Kotteakos v. United States (Kotteakos)*, 328 U.S. 750, 776 (1946)); *Sanna, supra*, 265 F.3d. 14. Under this standard, however, the petitioner should prevail whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error." *O'Neal v. McAninch (O'Neal)*, 513 U.S. 432, 436 (1995). As the Fifth Circuit views this, if the mind of the reviewing judge is "in virtual equipoise as to the harmlessness under the *Brecht* standard, of the error," then she "must conclude that it was harmful." *Robertson v. Cain* 324 F.3d 297, 304 -305 (5th Cir. 2003), (quoting *Woods v. Johnson*, 75

F.3d 1017, 1026-27 (5th Cir.1996), in turn quoting *O'Neal,* 513 U.S. at 435).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD.

*Strickland v. Washington (Strickland),* 466 U.S. 668 (1984) states the two-prong test under the Sixth and Fourteenth Amendments to the United States Constitution. First (performance), a "defendant must show that counsel's representation fell below an objective standard of reasonableness," measured, in part, according to prevailing professional norms. *Id.* 687-688. A "reasonably competent attorney" performs "within the range of competence demanded of attorneys in criminal cases," *United States v. Cronic,* 466 U.S. 648, 655 (1984), citing authorities. Second (prejudice), he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* 694. "The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction [on grounds of ineffective assistance of counsel], the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland, supra,* 466 U.S. 695.

An ineffective assistance of counsel claim presents a mixed question of law and fact. *Id.,* 466 U.S. at 698. This court is not bound by

11

the conclusions of the state courts that counsel rendered effective assistance. *Anderson v. Butler*, 858 F.2d 16, 18 (1st Cir.1988). "The *Strickland* principles for deciding ineffective assistance of counsel claims are 'clearly established' for purposes of the AEDPA." *Ouber v. Guarino* (*Ouber*), 293 F.3d 19, 26 (1st Cir. 2002).[5]

As regards a claim that evidence was not brought before the factfinder due to ineffective assistance of counsel (petition, ground four), the opinion in (*Terry*) *Williams v. Taylor, supra*, involving a federal habeas corpus petition claiming ineffective assistance, sets further governing standards. It (1) cites A.B.A. standards as an example for counsel's duty to investigate; (2) promotes the need to reweigh both evidence that came in at trial and evidence which did not, in order to determine what effect the latter evidence would have had on the trier of fact (here, as to whether the factfinder would have had a reasonable doubt), so that evidence which may sometimes be considered "cumulative" should still be used in the "reweighing" process; (3) mandates acceptance of the reality that, even if "not all of the additional evidence was favorable,"

---

[5] "Inferences, characterizations of the facts, and mixed fact/law conclusions are more appropriately analyzed under the 'unreasonable application' prong of section 2254(d)(1). *Cf. Townsend v. Sain,* 372 U.S. 293, 309 n. 6, (1963) (stating that mixed questions of fact and law do not fall within the purview of section 2254(d)(2)); *Sanna,* 265 F.3d at 7 (only witness credibility and recitals of external events qualify as basic or primary facts for purposes of section 2254(d)(2)). Inasmuch as 'both the performance and the prejudice components of the ineffectiveness inquiry are mixed questions of law and fact' for the purposes of federal habeas review, *Strickland,* 466 U.S. at 698, section 2254(d)(2) is of limited utility" on an ineffective assistance of counsel issue. *Ouber,* 293 F.3d at 27.

evidence which would have helped defendant should have been presented to the fact finder; and (4) does not accept a counsel's "tactical decision" in simply relying upon what was available to him without further investigation as representation within an objective standard of reasonableness. *Id.* 529 U.S. at 394-399. The U.S. Supreme Court has decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S., at 690-691.

In this context, this court must first decide the merits of the *Strickland* claim as if it were deciding it de novo. If the court finds that defense counsel was ineffective, it then may go on to determine whether the state court's decision was an "unreasonable application" of *Strickland*. See Randy Hertz & James S. Liebman, 2 *Federal Habeas Corpus Practice & Procedure* 1356 (4th ed. 2001 & 2002 Supp.) [*FHCPP*]; see also *(Terry) Williams v. Taylor, supra*, 529 U.S. 390-98 (Stevens, J., for majority, analyzing Williams' claim according to this sequence), 412-16 (O'Connor, J., concurring, analyzing Williams' claim according to this sequence); *Ouber, supra*, 293 F.3d 30 (analyzing claim according to this sequence, and explaining that "[w]ere we sitting in direct review, the foregoing analysis would lead us to find counsel's performance constitutionally unacceptable. In the exercise of habeas jurisdiction,

13

however, we must take another step and evaluate the reasonableness of the Appeals Court's contrary conclusion.").

### III.   REASONS FOR GRANTING THE PETITION

**GROUND ONE.**

**WHEN THE MASSACHUSETTS COURTS ABSOLUTELY EXCLUDED POTENTIALLY EXCULPATORY EVIDENCE FROM EDDIE HAWKINS, A WITNESS CALLED BY PETITIONER, THEY VIOLATED HIS COMPULSORY PROCESS CLAUSE RIGHTS BY UNDULY ELEVATING COURT-MADE EVIDENCE RULES OVER THOSE RIGHTS, THUS MAKING THE SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE SUPERFLUOUS AS A TOOL OF A FAIR PROCESS.**

**A.     When the right to present a defense is involved, use of the adversarial system, rather than absolute exclusion, is the preferred means for dealing with possibly unreliable testimony.**

Few rights are more fundamental in our nation than that of an accused to present his version of the facts in keeping with the Sixth Amendment's Compulsory Process Clause right to present defense evidence and witnesses. *Crane v. Kentucky*, 476 U.S. 683, 687 (1986); *Washington v. Texas*, 388 U.S. 14, 19 (1967). These rights are necessary to ensure that the accused is not deprived of a fair trial. *Id.* at 17-19; *Chambers v. Mississippi*, 410 U.S. 284, 302-303 (1973).

The United States Supreme Court set out only two requirements for the presentation of a defense witness's testimony: that it be "relevant" and "material" to the defense. *Washington v. Texas, supra*, 388 U.S. at 23. This leaves the "credit and weight of such testimony to be determined by [the factfinder]." *Id.* at 22 (internal quotation marks omitted). Accord,

14

*Crane, v. Kentucky, supra,* 476 U.S. at 688. One year after *Crane,* the majority in *Rock v. Arkansas,* 483 U.S. 44 (1987) solidified an accused's right to present a defense, resulting in an opinion shaped by the requirements of a fair adversarial system, and not one based merely on rules of evidence. That is, when reasonable men could disagree over the reliability of the testimony of a proposed defense witness, rather than absolute exclusion, the preferred and least restrictive way of dealing with possible unreliability is by such means as corroboration of the testimony, independent evidence, cross-examination, or jury instructions. *Id.* at 61.

### B.    Petitioner's need for Eddie Hawkins' testimony.

The petitioner wished to call Eddie Hawkins (Hawkins or Hawk) based upon a report of his statements to police detectives [O'Leary report, A. 122] at the Essex County House of Correction. Hawkins' statements bolster petitioner's position to this effect: Tinsley was in Walaikum's at the time of the shooting; Tinsley was the shooter ("it's my body, Hawk") and; John [who was Jimmy's - a.k.a. "45's" - brother, merely drove the car away. [Id.][6]

In Hawkins' voir dire, he verified the contents of the O'Leary report on these points: the reason he was in MCI[7] Concord [*10/13*]; he met Tinsley a few years before in another facility and he and Tinsley were cell mates in MCI Concord [*10/14*]; as cell mates, he had talked with Tinsley

---

[6] Hawkins was unavailable [*1/12-20; 8/5-15*] until after John and Jimmy testified. After a side bar conference [*10/4-11*), Hawkins testified in a voir dire.

[7] Massachusetts Correctional Institution.

about a murder, and Tinsley was waiting to go to court on a murder charge [*10/16-17*]; he got the nickname, "45" from talking about the case with Tinsley [*10/19*]; he thinks that Tinsley told him that " he thought he might cop a plea of 18-20," but then Tinsley found that the police couldn't put him at the murder scene but could only put him in the car used to make the getaway from the scene. [*10/25*] Hawkins said that he made up the rest, looking for a deal. [*10/18*]

John still wished to call Hawkins. Overriding his counsel's argument to let the jury decide what credit and weight they would give to Hawkins' testimony, the trial judge ruled over objection that John could only ask Hawkins "whether or not he had a conversation with Mr. Tinsley regarding the allegations before this court." On that basis, John declined to call Hawkins, and rested his case. [*10/28-34*]

The judge's ruling effectively deprived petitioner of his constitutional right to defend himself. If John were permitted to conduct a direct examination in the normal manner, Hawkins would have at least made the verifications on the above-mentioned points. Those verifications would have given the jury favorable substantive evidence for John. If Hawkins' testified before the jury that the rest was fabricated, that could have been impeached by the testimony of Detective O'Leary who would have been called by John. [A. 253-254, par. 7][8] Either way, John still

---

[8] This is similar to the trial judge's permitting the Commonwealth to call Detective Dorch on his report of Neal's alleged statements. See ground two, *post*.

would have been warranted to argue in his closing that Tinsley's statements to Hawkins: (1) tended to show that Tinsley had been the shooter in Walaikum's; and (2) bolstered John's testimony about someone else being the shooter which, in turn, would have bolstered petitioner's entire defense.[9]

The court's action violated John's "compulsory process" rights under the Sixth and Fourteenth Amendments of the United States Constitution.[10] John expected to present testimony of probative value from Hawkins which tended to exculpate him; Hawkins had no competing right. Any restriction on the petitioner's right to call witnesses or on the scope of the examination of those witnesses cannot be arbitrary. Allowing the jury to hear Hawkins testify, verifying parts of the O'Leary report, does not run counter to any legitimate demands of the adversarial system. Hawkins would not be exposed to any loss of rights if he testified. Tinsley would have been able to protect own his rights through his trial counsel. Hawkins' testimony would not likely have the taint of bias or interest usually attributed to a testifying defendant, so it

---

[9] This is congruent with the situation in *Washington*, where he wished to call a co-defendant who would have testified consistently with his defense. *Washington v.Texas, supra* , 388 U.S. at 16.

[10] Petitioner's opening mentioned Hawkins, but he was limited by the court to saying that Hawkins "is scheduled to [be] a witness ... and he will have some important information ...." [8/29-31] .The judge told the jury "that the witness we scheduled will not be here until tomorrow ...." [9/6] Both of these remarks additionally prejudiced petitioner when he could not deliver on his promise through no fault of his own.

would likely have been more persuasive than John's. See *Arizona v. Fulminante*, 499 U.S. 279, 297-300 (1991).[11] Hawkins' testimony would have been relevant and material, and would have had a substantial positive influence for John: on Tinsley's responsibility for the death of the victim, and on John's defense.[12]

### C. Flaws in the SJC's analysis and conclusion.

The SJC's analysis and conclusion, using the broad-brush joint venture approach to negate any help which might flow to John from Hawkins, unreasonably elevates theory over the reality existing in that particular courtroom. Although the Commonwealth gave lip service to a joint venture theory, the manner in which it tried the case, and the overwhelming emphasis of its closing was designed to convince the jury that this was a two-gun-two-shooter case, that there was no question that Jimmy fired one gun at the scene of the crime, and that John was the other shooter. (Tinsley's inclusion as a defendant was based only on evidence of his presence with the others going to the crime scene, at the

---

[11] To state this in other terms, any suggestion that Hawkins' evidence might be merely "cumulative" fails to appreciate courtroom reality, especially given the heavy use of "prior bad act" impeachment during the prosecutor's cross-examination of John. See DB 45-53.

[12] The judge's ruling constructively barred John from examining Hawkins. The arbitrary nature of this can be more appreciated when compared to the judge's rulings on Neal's testimony. (Ground two, *post*, at 22-23) If the judge was correct in handling Neal's testimony, he should have permitted Hawkins to testify; conversely, if he was correct in limiting Hawkins' testimony, he should have similarly limited the use of Neal's. If the fair trial rights in the Sixth Amendment had any goal, it was to ensure to the accused at least the rights of the prosecution as a minimum.

18

crime scene, and leaving the crime scene; Brown's inclusion was based
on the same factors as Tinsley's, with the addition that he was alleged to
have "fingered" the victim.) It is implausible that this particular jury, on
the state of the evidence enhanced by the prosecutor's argument, could
have believed that the Commonwealth was only claiming that John was a
mere joint venturer, i. e., that he was merely present with the group and
then acted as a getaway driver. Any rational juror, rather, would believe
that the Commonwealth's only claim was that John was the other
shooter. Evidence taking the gun out of John's hands at Walaikum's and
putting it in Tinsley's would have raised reasonable doubt as to the
murder and gun-related charges against John arising out of the shooting
at Walaikum's.

### D.    The thrust of the Compulsory Process Clause cases.

The thrust of the Supreme Court's opinions is that the pathway to
the closest we mortals can come to the truth is by way of fair process. An
accused should have the opportunity to present his evidence even
though it may not appear at first blush credible to the trial judge. The
Supreme Court's opinions do not depend on whether the contents of the
proposed evidence were reliable or trustworthy, especially in *Crane v.
Kentucky*, where an accused's testimony is usually considered self-
serving and suspect, and in *Washington v. Texas*, because his co-
defendant's testimony under circumstances where he had already been
convicted of the murder would likewise be suspect.

19

### E. Habeas relief is merited under the statute and the "harm" standard.

As the foregoing discussion shows, the state court's decision is contrary to, and an unreasonable application of relevant Supreme Court precedent in *Crane v. Kentucky*, 476 U.S. 683, 687 (1986); *Washington v. Texas*, 388 U.S. 14, 17-19 (1967);. *Chambers v. Mississippi*, 410 U.S. 284, 302-303 (1973); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Arizona v. Fulminante*, 499 U.S. 279, 297-300 (1991).

Deprivation of Hawkins' evidence had a "substantial and injurious effect or influence in determining the jury's verdict" under the *Kotteakos/Brecht/O'Neal* standard, *ante* at 10. See sections B and C, *ante*.

### GROUND TWO.
**WHEN THE TRIAL JUDGE, AFTER THE VOIR DIRE OF A PROSECUTION WITNESS THAT MADE IT CLEAR THAT THE WITNESS (MARVETTE NEAL) WOULD GIVE THE JURY TESTIMONY OF NO EVIDENTIARY VALUE ABOUT THE COMMISSION OF THE CRIME, STILL PERMITTED THE WITNESS TO TESTIFY OVER OBJECTION, SUCH RULING VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.**

### A.    The fundamentally unfair and inconsistent rulings on Hawkins and Neal.

The compulsory process right to present a defense and the right of confrontation, along with the other rights enumerated in the Sixth Amendment, are stated as rights of the accused "in all criminal prosecutions." The right to present a defense by eliciting facts favorable to the accused, and the right of confrontation by discrediting the

20

prosecution's case are the interrelated parts of a complete defense, using different means for achieving the same goal: to raise reasonable doubt about the accused's guilt in the minds of the jurors. So the right to confront and discredit (impeach) is stated in terms of the petitioner having the right, and not the prosecutor. As regards the Marvette Neal controversy, the prosecutor used subterfuge and the state court erroneously permitted him to appropriate that right.

If the state court may exclude Hawkins' from testifying, after a showing that he could give some valuable evidence in petitioner's favor, and thereby also deny petitioner the opportunity to call Detective O'Leary to the stand to impeach Hawkins on other details, the court should have also excluded Neal from testifying, after he had already shown that he would not give testimony of any evidentiary value, thus denying the prosecution the opportunity to call Detective Dorch to "impeach" Neal. On the other hand, if the state court may permit the Neal-Dorch subterfuge to take place, it should also have allowed Hawkins to testify subject to cross-examination, jury instructions, corroboration, impeachment, and the like.

### B.   The Dorch report.

The February 10, 1995 report by Detective Dorch (Dorch report) of his interview with Neal indicates that: Neal was in Walaikum's at the time of the shooting; he saw the two Evans brothers there, both of whom he had known for some time; "Marquis" (street name for Jimmy) first

21

stared, and then ratcheted a silver handgun and fired approximately five shots at the victim; "Marquis" left the store and "Tiny" (street name for John) came into the store and fired 3-4 shots at the victim.

### C.    Neal's grand jury testimony.

In his February 16, 1995 testimony [A.86-98] before the grand jury, Neal did not remember "Marquis" staring at the victim, or taking out a silver handgun, or exactly what he told police. He remembered someone getting shot, not who shot him. He merely identified "Marquis" and "Tiny" as knowing them and "saying that they were at the place where the murders take [sic] place." [A. 87-92] He was on the floor when the shooting happened, and did not remember telling the police that the Evans brothers were responsible for the shooting. [A. 88-95]

### D.    Neal's voir dire at trial.

Even after Holliday testified that he did not see Neal, whom he knew, inside Walaikum's during the shooting incident [3/63], the prosecutor wanted the problematic Neal to testify. [4/81-84,160] Neal did not remember: telling the police that "Marquis" stared at the victim, ratcheted a gun, fired approximately five shots at the victim, or that "Tiny" came in and fired three to four shots at the victim [4/167-168]. He denied seeing the shooting and telling officers that he saw the shooters [4/169]; denied selecting John as the second shooter and; denied identifying Jimmy as the first shooter. He then explained that, "I was asked if I saw [John and Jimmy] in the [photo array] and that's how I

22

identified them, as knowing they were," and that is why his signatures appeared on the two photo arrays. [4/170-171]

### E.    Neal's testimony: "no evidentiary value."

It was clear by this time that Neal would give the jury no probative evidence about the shooting at Walaikum's. Yet, with this foreknowledge, after a side bar conference and over objections, the prosecutor was permitted to ask Neal questions on direct about his interview by Detective Dorch. After Neal testified in keeping with his voir dire testimony, including denial of his signing the photo arrays [4/187-195], the court instructed the jury that <u>all of this had no evidentiary value</u>. [4/195] But this permitted attorneys for Brown [4/199], and Tinsley [4/210] to exacerbate the damage to John.

### F.    Dorch's trial testimony: received only as "impeachment" of Neal's testimony.

Detective Dorch, over objections, but along with limiting instructions that his testimony was not substantive evidence, was permitted to testify as to what Neal purportedly told him about the shooting at Walaikum's. [5/9-17] The court further instructed that Dorch's testimony was "offered as impeachment of Mr. Neal's testimony ... and not as substantive evidence." [5/17] Dorch, over objection, then told the jury that Neal identified John and Jimmy from the photo arrays as being the shooters, and that Neal signed each array. The arrays were then marked as exhibits. [5/19-25] Brown's counsel led Dorch over the details of his report several more times. [5/26-36]

### G.    Neal's grand jury statements admitted as "substantive evidence."

The only "substantive evidence" the judge attributed to Neal came from his grand jury testimony: first during Neal's direct examination [4/ 175-186], when the judge stated in open court, "Okay. That's past recollection recorded." Then, over objections, the grand jury court reporter read five questions and answers to the jury, to this effect: Neal knew John and Jimmy, and saw them in the store; he identified their photos "as knowing them and saying they were at the place where the murder[] [took] place;" and he saw them at Cortees. [7/ 19-27] The prosecutor should not have been permitted to use Neal's purported statements to the police or to use his grand jury testimony.

### H.    Impeachment: when proper and when subterfuge.

The purpose of impeachment is to discredit a witness who gives probative evidence against the party impeaching him. P. J. Liacos, *Handbook of Massachusetts Evidence* (Brodin & Avery, eds., 6th ed., 1994) at 264. As to a party's own witness, "[t]he maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised." *United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1994) (citations omitted). The prosecutor knew that Neal would give no probative evidence against the Commonwealth that needed "cancellation." Placing Neal on the stand in order to later impeach him by hearsay evidence violates the above principles, and the principle stated

24

in *Commonwealth v. Benoit*, 32 Mass. App. Ct. 111, 114-117, 586 N.E.2d 19 (1992), and authorities cited therein as to the nature of the error and the prejudice flowing therefrom. See, also, *Commonwealth v. McGee*, 42 Mass. App. Ct. 740, 745-746, 679 N.E.2d 609 (1997). Accord *Commonwealth v. Rosa*, 412 Mass. 147, 162-163, 587 N.E.2d 687 (1992) (citing federal cases invoking due process concerns offensive to fundamental fairness when testimony elicited at trial with intent simply to provide foundation for impeachment by prior inconsistent statement).

The Commonwealth's closing is telling as to its use of Neal: Neal "places the two Evans brothers in Walaikum's. He places them up at Cortees." [10/137-138] The prosecutor spoke of Neal's purported statements to Detective Dorch, as compared to his in-court testimony, in a disparaging and discrediting way, but nothing Neal said needed discrediting. Mentioning Dorch's testimony as to what Neal purportedly told Dorch was the prosecutor's invitation to the jury to accept Dorch's words as substantive, judge's instructions notwithstanding, a warned-against result in *Commonwealth v. Benoit, supra,* 32 Mass. App. Ct. 117, 586 N.E.2d 23. The judge's later instructions would not rectify the error. "[A]sking the jury to [limit its use of the evidence once they have heard it] may be tantamount to asking the jury to ignore that an elephant has walked through the jury box." *Commonwealth v. Flebotte*, 34 Mass. App. Ct. 676, 680 (1993), S.C. 417 Mass. 348, 630 N.E.2d 265 (1994). Justice Jackson, in his concurring opinion in *Krulewitch v. United States*, 336

25