U.S. 440, 453 (1949), said that: "The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction."

Dorch's recitation of Neal's statements, the only statements attributed to someone who knew John, positively naming him as a shooter in Walaikum's, was the "elephant" that the jury was asked to ignore.[13] In *United States v. Gomez-Gallardo, supra*, a witness testified the same way in front of jury as he did in voir dire and, although there was no objection, the reviewing court found "plain error" for the use of impeachment when "employed as a guise for submitting to the jury substantive evidence that is otherwise unavailable." *Id.*, 915 F.2d 555-556, n.5. The evidence against John from other sources was not overwhelming. We cannot say with fair assurance that the trial judge's handling of the Neal-Dorch report situation did not have a significant impact on the jury's decision.

Neal's grand jury five questions and answers were inadmissible. In *Commonwealth v. Daye*, 393 Mass. 55, 469 N.E.2d 483 (1984), the SJC set these limits: "a prior inconsistent statement is admissible as probative if made under oath before a grand jury, <u>provided the witness can be effectively cross-examined as to the accuracy of the statement</u>

---

[13] Clarke's testimony about gunman # 1 might apply to John, but he stated that gunman # 1 fired first and had a chrome/silver gun; Holliday said that Jimmy had the chrome/silver gun (he ran out and did not see anything else); and Neal's "statement" in the Dorch report was that Jimmy had the chrome/silver gun and fired first.

....."*Id.* 74 (emphasis supplied). Here, Neal did not remember: seeing the Evans brothers at Cortees or telling that to the grand jury [*4/175-176,180*]; seeing the Evans brothers inside Walaikum's or telling that to the grand jury. [*4/181-182, 184*] The petitioner, therefore, could not effectively cross-examine Neal as to the accuracy of those statements read to the jury because Neal had no memory of making them and did not remember the facts underlying the statements. "Where a witness has no present memory as to the substance of the prior statement, its admissibility is generally precluded because opposing counsel would not have an opportunity for meaningful cross-examination of the witness at trial." *Commonwealth v. Martin,* 417 Mass. 187, 197, 629 N.E.2d 297 (1994). A meaningful and effective cross examination is required by the Sixth and Fourteenth Amendments to the United States Constitution. *Commonwealth v. Michel,* 367 Mass. 454, 459-460, 327 N.E.2d 720 (1975); *Commonwealth v. Johnson,* 365 Mass. 534, 543-544, 313 N.E.2d 571 (1974).

## I.   The SJC's flawed rulings concerning impeachment of Marvette Neal.

The SJC acknowledged that Neal's grand jury testimony was not admissible under any theory, but "saved" the error by deeming it "cumulative." *Commonwealth v. Evans,* 439 Mass. 184, 190-191, 786 N.E.2d 384. That is contradictory to, and an unreasonable application of, the *Kotteakos/Brecht/O'Neal* standard, *ante* at 10.

The SJC, also, focused on the incorrect point in time for deciding the *Benoit*-subterfuge issue. The cases and authorities discussed and relied upon in *Benoit* and others cited herein focus on the judge's consideration of an objection by the defendant at the time the witness is under oath on direct before the jury, and not at some later time. The correct time in this instance is at the end of a side-bar conference while Neal was still on direct. [*4/190-193*] By that time, there could have been no reasonable expectations by the prosecutor, the defense lawyers, or the judge that Neal would admit making the particularized statements attributed to him in the Dorch report, and no reasonable expectations that his testimony would have any evidentiary value, so that the proposed line of questioning only would be a *Benoit*-type subterfuge for otherwise inadmissible testimony given later by Detective Dorch. It should have ended there. Instead, Neal was allowed over objection to be questioned about events of the shooting which would produce testimony of no evidentiary value, and then Dorch was allowed to "impeach" Neal.

While acknowledging the "guise" for allowing Neal to testify over objection,[14] the SJC "saved" the resulting prejudice by focusing on defense counsels' (John's and Jimmy's) questions to Neal on cross-examination. This puts the cart before the horse. Each counsel was placed in a zealous advocate's quandary. Counsel could not ignore the "elephant" that got into the jury box. Each of them tried to mitigate the

---

[14] *Evans*, 439 Mass. 192, 786 N.E.2d 384.

damage resulting from the judge's erroneous ruling permitting Neal to continue to testify on direct. What other undue damage happened after this erroneous ruling? During his cross-examination by Brown's counsel, Neal blurted out that he had been arrested and brought in, which led to the jury being exposed to his having to be arrested "to insure [his] appearance" to testify. [4/204-205] Counsel for Tinsley later got Neal to admit that he was "not real happy to be here today" and that "it took some assistance to get [him] here today." [4/211]

The prosecution completed the goal of its subterfuge when it called Dorch to the stand. Dorch was permitted, over objection, to tell the jury that Neal identified John and Jimmy from the photo arrays as being the shooters, and that Neal signed each array. The arrays were then marked as exhibits and published to the jury. [5/19-25] Counsel for Brown later led Dorch over the details of Neal's alleged prior statements several more times. [5/26-36]

### J.    Habeas relief is merited under the statute and the "harm" standard.

Summarizing the details stated in the previous sections, the state court allowed Neal to testify even though it was clear, as stated to the jury by the trial judge, that his testimony had no evidentiary value. The judge's allowance exposed the jury to the following: (1) Neal's direct examination about the incriminating statements he allegedly made to Dorch about John's involvement in the shooting; (2) The cross-

examination of Neal by Brown's and Tinsley's lawyers, including reprises of Neal's alleged statements to Dorch; (3) Neal's grand jury statements being read to the jury as "substantive evidence"; (4) Dorch, albeit with limiting instructions, testifying as to what Neal allegedly told him about John's role in the shooting at Walaikum's, under the guise of impeachment of Neal's testimony; (5) Allowance in evidence of the photo arrays, allegedly signed by Neal in identifying John as being one of the shooters; and (6) Cross-examination of Dorch by Brown's counsel, leading Dorch to repeat the details of his report several more times.

As regards these above-summarized events at trial and the resulting harm to John, the SJC erroneously allowed the Commonwealth (1) to get away with using subterfuge, and (2) erroneously allowed the Commonwealth to appropriate the right of confrontation and impeachment granted solely to an accused by the Sixth Amendment.

The SJC justified the subterfuge based on the fact that John's and Jimmy's defense counsel posed to Neal on cross-examination certain questions designed to ameliorate the damage caused during his direct. *Evans*, 439 Mass. 192, 786 N.E.2d 384. This ruling punished John for the reasonable advocacy of his defense counsel. The trial court's initial mistake of allowing Neal to take the stand and testify at all triggered a duty of John's counsel to make the best of the bad situation caused by the trial judge. His counsel had no other reasonable choice but to cross-examine Neal as he did. The SJC's condonation of the subterfuge and

resulting harm amounts to a distortion and rejection of petitioner's rights of confrontation and to effective assistance of counsel under the Sixth and Fourteenth Amendments. Cf. *Herring v. New York,* 422 U.S. 853, 857 (1975) ("right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments.").

In addition, all of this damage should be considered in terms equivalent to the "fruit of the poisonous tree" principle. It was fundamentally unfair and a denial of due process to allow the prosecutor to use Neal as a subterfuge. It is analogous to the knowing use of false testimony, see e. g., *Giglio v. United States,* 405 U.S. 150 (1972) and *Brown v. Wainwright,* 785 F.2d 1457, 1464 (11th Cir. 1986), or the knowing use of false evidence, see *Napue v. Illinois,* 360 U.S. 264, 269 (1959).

The SJC decision, moreover, did not address this issue on any of the above-mentioned constitutional grounds. Its decision, therefore deserves no deference from a federal court, so that the proper standard is de novo. *Watkins v. Murphy, supra,* 292 F.3d 75-76. The harm to petitioner, as above detailed, meets the *Kotteakos/Brecht/O'Neal* standard, *ante* at 10.

31

**GROUND THREE.**

**WHEN THE TRIAL JUDGE, WHO IN THE ABSENCE OF *VAN ARSDALL* CONCERNS, FORBADE ACCUSED FROM USING, IN CROSS-EXAMINATION OF A KEY PROSECUTION WITNESS, THE ACTUAL NAMES OF THE UNRELATED CHARGES – RAPE, KIDNAPPING, AND ASSAULT AND BATTERY WITH DANGEROUS WEAPON – THEN PENDING AGAINST THE WITNESS IN THE SAME COUNTY, AND ONLY PERMITTED REFERENCES TO THEM AS "SERIOUS CHARGES, SUCH RULING VIOLATED THE ACCUSED'S SIXTH AMENDMENT CONFRONTATION CLAUSE RIGHT TO SHOW WITNESS BIAS.**

**A.    Petitioner's need and right to show bias.**

Alton Clarke was a key Commonwealth witness.[15] The prosecutor tried to protect him. He told the judge that Clarke was "facing very serious matters of rape amongst other charges," and asked "that counsel not be allowed to probe in those areas." [6/ 73-74] Defense counsel, to show bias, wanted to mention the specific names of the charges -- aggravated rape, kidnapping, and assault and battery, dangerous weapon. [A. 113] Over objections, the judge forbade references to the specific names of the pending charges. He ordered that defense counsel refer to them merely as "serious pending matters" [6/ 73-78], or "serious felony charges." [6/ 100-101]

Where, over multiple objections, the trial judge barred defense counsel from naming the specific charges facing a key prosecution

---

[15] He was the only witness who claimed to have seen: (a) two gunmen in Walaikum's, one firing at the victim; (b) the gunmen getting into the Lexus after the shooting and taking certain seats there; and (c) gunman # 1 still occupying the driver's seat when he saw the Lexus going by near his house. His testimony was not cumulative.

witness, he interfered with petitioner's constitutional cross-examination rights to show bias. The Sixth and Fourteenth Amendments to the United States Constitution give the accused rights to effective cross-examination of such a witness. *Commonwealth v. Michel, supra,* 367 Mass. 459-460, 327 N.E.2d 720, *Commonwealth v. Johnson, supra,* 365 Mass. 543-544, 313 N.E.2d 571, each citing Massachusetts and federal court cases on cognate constitutional rights. John's right to confront witnesses against him and his right to due process apply here. *Ids.* "Evidence tending to show that an important government witness is biased is exculpatory within the meaning of *Brady v. Maryland,* 373 U.S. 83 (1963)." *Commonwealth v. Jackson,* 388 Mass. 98, 112, 445 N.E.2d 1033 (1983).

Under the analysis of *Davis v. Alaska*, 415 U. S. 308, 317-320 (1974), the constitutional right to effective cross-examination to uncover the bias of an adverse witness is "so vital." *Id.* (emphasis supplied). Clarke's testimony provided a "crucial link in the proof of [John's] act" *id.*, and John needed to effectively explore why Clarke might be biased from which to argue from the record. Naming the specific names of the pending charges was the only fair way to explore why "[Clarke] might have been biased or otherwise lacked that degree of impartiality expected of a witness at a trial" *id.,* particularly Clarke's reason to come forward late, and his reason to hope for favorable treatment.

Where the accused needed to show the nature and extent of the

bias of a witness like Clarke, ordering the use of ineffective vague words like "serious charges" in place of the specific names of the charges improperly impeded petitioner's confrontation right. Although the dictionary meaning of the word, "serious" conveys a sense of gravity or importance, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3rd ed., 1996) at 1648, what is grave or important to some people may be of much less gravity or importance to others. The jury might not appreciate exactly what was at stake for Clarke as a reason for giving his testimony, given the date he first came forward and gave a statement to the police. Although he called 911 a few minutes after the January 25, 1995 Walaikum's shooting, he only reported it but did not give his name. On May 4, 1995, the aggravated rape, kidnapping, and assault and battery, dangerous weapon indictments were returned by a grand jury and filed against him in the Suffolk Superior Court, but only in October 1995 did he "come forward" to the police and give a statement in the instant case. [6/73-77, 96-100]

To lay jurors, charges of such significantly lower magnitude as operating under the influence of liquor or driving to endanger might be "serious." *Commonwealth v. Pappas,* 384 Mass. 428, 432, 425 N.E.2d 323 (1981); *Commonwealth v. Stracuzzi,* 30 Mass. App. Ct. 161, 566 N.E.2d 1151 (1991). But the words, "aggravated rape", "assault and battery with a dangerous weapon", and "kidnapping" would necessarily merit their attention and heightened scrutiny on the question of Clarke's

34

bias, whereas the words, "serious charges" might not. The question of bias, therefore, was not fairly and sufficiently aired, because the use of the specific names "would register quite a bit higher on [the influence to prevaricate] meter." *Commonwealth v. Piedra*, 20 Mass. App. Ct. 155, 156, 478 N.E.2d 1284 (1985); *Commonwealth v. Lewis*, 12 Mass. App. Ct. 562, 572-573 & n.20, 427 N.E.2d 934 (1981) and cases cited (jurors should know <u>nature</u> of pending charges so that they will have some means of gauging <u>extent</u> to which witness may be biased). (Emphasis supplied.)

On balancing the rights of those involved, John as an accused in a murder trial needed to use the specific names of the charges for his defense; Clarke would not have been prejudiced merely by the use of specific charge names, already on record and the subject of public bail hearings. With no need to go into the details or merits of the charges, there would be no impingement on Clarke's Fifth Amendment or cognate rights under art. 12 of the Massachusetts Declaration of Rights. As between the rights of John and the Commonwealth, the Commonwealth knew that such an important witness as Clarke would be subject to cross-examination on reasons for giving the evidence, such as bias, and would not have been prejudiced by the use of a few words needed to protect against loss of John's life-long liberty. The use of the few more words would not have been cumulative on Clarke's bias, and would not have lengthened the trial or have caused any undue hardship on the

Commonwealth. John, however, could not have presented the very probative, precise information on Clarke's bias in any other way. Other reasons for a trial judge to exercise discretion on limiting cross-examination, "harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant[,]" *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986), are also not present here.

Partial airing of the bias question is not enough when it applies to a key witness. Even though the judge, in *Commonwealth v. Connor,* 392 Mass. 838, 467 N.E.2d 1340 (1984), permitted extensive cross-examination of a key witness to impeach her testimony by showing prior convictions and possible bias stemming from past benefits received under a federal witness protection program, he committed reversible error in refusing to allow adequate cross-examination concerning the witness' then pending criminal charges. The SJC stated,

> the pendency of criminal charges might have inspired hope of lenity and fear of punishment if such lenity were not obtained. As a source of human motivation, gratitude pales beside hope and fear. In the circumstances, [petitioner] was entitled to the inquiry he sought. The judge's restriction of the cross-examination of [Clarke] was erroneous. Because of this error, the [petitioner] was limited in arguing the witness's motive to lie. The prosecutor, on the other hand, relied on [Clarke's] testimony in his summation and emphasized [Clarke's] lack of any motive to lie. Because the erroneous ruling tended to bolster the credibility of the Commonwealth's witnesses and to impair the[petitioner's] attack thereon, we cannot say that the error was harmless. Reversal is, therefore, required. *Id.* 842-842.

Accord *Commonwealth v. [Dauntel] Evans,* 512 A.2d 626, 628-633 (Pa.

36

1986) (analysis under Sixth Amendment to United States Constitution and cognate provision under Pennsylvania Constitution, *id.* n.2). "The reliability and credibility of [Clarke] was essential to the proof of the defendant's guilt, and refusal to allow cross-examination designed to show that his motive for testifying was [to obtain leniency on the aggravated rape and other charges then pending against him] was a serious error which requires a new trial." *Commonwealth v. Graziano,* 368 Mass. 325, 330, 331 N.E.2d 808 (1975).

### B.    The SJC's flawed reasoning.

Clarke, a key Commonwealth witness, could have been biased because of fears over his pending charges at the time he was testifying, notwithstanding his denials and the Commonwealth's claims of "no deal." The SJC's references to Clarke's subsequent trial, conviction and appeal misapprehend the point and are irrelevant to the judge's ruling at trial. The issue is the effect of John's argument during the closing on the bias of such a key witness, had he been able to use the more powerful specific names of the charges. The question and argument to the jury is whether Clarke, at the moment he was testifying, had harbored hopes of receiving lenient treatment on those specific charges if he testified favorably for the Commonwealth. Partial airing of this question is not enough for this key witness. The evidence against John from other sources was not overwhelming. "Serious damage to the strength of the State's case would have been a real possibility had ... [the petitioner]

37

been allowed to pursue this line of inquiry." *Commonwealth v. Franklin,* 366 Mass. 284, 290, 318 N.E.2d 469 (1974), quoting *Davis v. Alaska,* 415 U.S. 308, 319 (1974).

The SJC misapprehended what the trial judge did on this issue. He did not exercise discretion at all. Judicial discretion is defined as the "exercise of judgment by a judge or a court based on what is fair under the circumstances and guided by the rules and principles of law ...." BLACK'S LAW DICTIONARY (deluxe; 7th ed. 1999) at 479 (emphasis supplied). The SJC did not articulate any rule or principle of law applicable to this case sufficient to warrant bringing the use of discretion to bear on limiting John's cross-examination of Clarke, other than to say merely that the judge may exercise discretion to do so. But activating a latent power to exercise discretion, in the absence of a legitimate *Van Arsdall* type of concern, violates petitioner's cross-examination rights. Furthermore, "[a]n adjudicator's failure to exercise sound, reasonable and legal decision-making is an abuse of discretion." BLACK'S LAW DICTIONARY, *supra,* at 10.

When an accused, like John, starts out with constitutional rights to present a defense either by presenting evidence of his own, or by cross-examining the prosecution's witness to show bias, he should not be limited unless there is a sufficient legitimate state interest to act as a counterweight against those rights. *Rock v. Arkansas,* 483 U.S. 44, 55 (1987); *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986). Such

legitimate counterweights (reasons to exclude cross-examination questions) are set forth in *Van Arsdall*. The trial judge may be permitted to exercise his discretion only when presented with such a counterweight. Neither the trial judge nor the SJC articulated a legitimate state interest as a reason to exclude the naming of Clarke's pending charges in John's cross-examination. That exclusion unduly thwarted John's need and right to bring out the "nature of the unresolved charges pending against the witness so that [the jury] have some means of gauging the extent to which the witness may be biased." *Commonwealth v. Lewis, supra,* 12 Mass. App. Ct. 573, n.20, 427 N.E.2d 934. Restrictions on John's cross-examination rights without a legitimate reason are arbitrary, *Rock v. Arkansas, supra,* 483 U.S. 56, and thus are abuses of discretion requiring reversal.[16]

### C. Habeas relief is merited under the statute and the "harm" standard.

As the foregoing discussion shows, the state court's decision in contrary to, and an unreasonable application of, Supreme Court precedent in *Davis v. Alaska, supra,* 415 U. S. 317-320; *Delaware v. Van Arsdall, supra* 475 U.S. 679; *Rock v. Arkansas, supra,* 483 U.S. 56. Preventing defense counsel from naming the names of specific charges in

---

[16] Cf. *Banks v. Dretke,* ___U.S.___, 124 S.Ct. 1256, 1261 (2004) (Court "has long allowed defendants broad latitude to cross-examine informants and has counseled the use of careful instructions on submission of the credibility issue to the jury.").

an unrelated case pending against Clarke while he was testifying in the instant case had a "substantial and injurious effect or influence in determining the jury's verdict" under the *Kotteakos/Brecht/O'Neal* standard, *ante* at 10. See sections A and B, *ante* at 32-39.

**GROUND FOUR.**
> **PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO SEEK SEVERANCE SO THAT PETITIONER COULD HAVE OBTAINED EXCULPATORY EVIDENCE FROM CO-DEFENDANT ROBERT BROWN III AS WELL AS OTHER EVIDENCE FROM BROWN WHICH WOULD HAVE SUBSTANTIALLY STRENGTHENED HIS CASE.**

**A.    The nature of Brown's evidence.**

Brown's evidence was unavailable to John because he was tried with John, and he used his constitutional right not to testify. John had no constitutional right or subpoena power to have access to Brown's testimony. *Commonwealth v. Gagnon*, 408 Mass. 185, 194-198, 557 N.E.2d 728 (1990), and cases cited; *Commonwealth v. Slonka*, 42 Mass. App. Ct. 760, 769, 680 N.E.2d 103 (1997).[17] Brown would have testified for petitioner had he been tried first and separately. [A.106, 109-110, 130, 251]

Brown's evidence would have bolstered John's on three points: (1) John's location and doings <u>outside</u> Walaikum's, negating John's knowledge, presence and participation as to what happened <u>inside</u> Walaikum's; (2) later talk in the car about Jimmy and Tinsley having

---

[17] Cf. *Commonwealth v. Babbitt*, 430 Mass. 700, 707 n.6, 723 N.E.2d 17 (2000) (probable that co-defendant unavailable, as he would likely invoke right against self-incrimination at defendant's trial).

guns and John's stopping the car, negating John's having had prior knowledge of another person's possession of a gun or intention to use a gun inside Walaikum's; and (3) Tinsley's self-incriminating statements, once, while in the car soon after the shooting, and at two other times about which the jury did not hear, one later that same morning, and another while awaiting trial. [A.107-109] Brown's evidence strongly suggests that Tinsley was the only shooter and corroborates John on this point as well as in points 1 and 2. Brown has other information the jury did not have: he locates on a color photo the approximate spots where the car was parked, marked, "L," and where he went, marked, "B." [A.108, 112] Brown's trial attorney, Mr. Sheketoff, affirms that Brown's testimony is wholly consistent with Brown's position right from the beginning, and further affirms that he advised Brown not to testify at the trial, but would have allowed Brown to testify for John had Brown been tried first and separately. [A.106-108, 201] The unavailability of affidavits from Brown and Mr. Sheketoff are also explained. *Id.*[18]

As to Brown's credibility, see *Commonwealth v. Grace*, 397 Mass. 303, 311-312, 491 N.E.2d 246 (1986) (post trial confession of defendant's

---

[18] Brown was not, and could not be for reasons given, listed as an alibi witness. Before trial, also for reasons given, any attempt to preserve testimony would have been futile. If subpoenaed now, he would give evidence tending to exculpate John. Post-trial, John requested leave to issue a deposition subpoena in order to depose Brown under oath, the first seeking funds and the second with funds in-hand, but the state courts denied him the opportunity to do so. [A.84, 141-144, 249-254, 353, 356; DB 14-20, 53-57, 72-75]

brother, Ross, was not "so devoid of credibility as to render it unworthy of all belief"). Brown, on the other hand, does not even have Ross Grace's impairments: he is not John's brother, did not testify at trial, has no prior testimony to recant, and is not giving evidence at this time in order to help himself. On being booked, he was the only one to give his true name. [5/218, 229-230, 232, 238][19] Brown's evidence would probably have been a real factor in the jury's deliberations, carries a measure of strength in support of defendant's position, and casts real doubt on the justice of the conviction.

**B.     Brown's evidence is material and exculpatory.**

Brown's evidence is material and exculpatory because, when it is "evaluated in the context of the entire record, [the evidence] creates a reasonable doubt that did not otherwise exist." *Commonwealth v. Vieira*, 401 Mass. 828, 832-833, 519 N.E.2d 1320 (1988). See discussion in *Arizona v. Fulminante*, 499 U.S. 279, 297-300 (1991) (in assessing impact and credibility of one witness's testimony, testimony by a second witness tends to make the less believable testimony of first witness more believable). This would make more believable John's testimony, if it came after Brown's, keeping in mind that the only non-defendant witness whose testimony tended to show that John was not in Walaikum's that

---

[19] As to testimony from a person who has been convicted of a crime, see *United States v. Burns*, 898 F. 2d 819 (1990) (government cannot complain against defendant's proposed use of co-defendant's testimony to corroborate his position and help exculpate him; court recognizes that government uses admittedly guilty co-defendants every day, while claiming that they are "useful—even vital … "). *Id.* 821.

night was Mr. Wiggins. *Commonwealth v. Bennett,* 43 Mass. App. Ct. 154, 157-162, 682 N.E.2d 648 (1997), and authorities cited therein, recognize the role of the jury in determining the importance of the newly available evidence against claims that it might be cumulative.

### C.    John's counsel was ineffective in failing to seek severance.

Petitioner's counsel failed to seek severance so that Brown could provide exculpatory and material evidence for John. Defense counsel Hutton's affidavit describes his pretrial knowledge of Brown's potential evidence. [A.251-253] That is consistent with the information contained in undersigned counsel's affidavit [A. 204-207] and John's affidavit [A.227-229].

As shown above, counsel had a basis to move for severance that would have outweighed reasons for joinder. This loss of use of Brown's evidence impinged defendant's fundamental right "to present ... his version of the facts," *Washington v. Texas, supra.,* 388 U.S. 19, *Chambers v. Mississippi, supra.,* 410 U.S. 302-303, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

Had counsel timely moved, pursuant to Mass. R. Cr. P. 9(d), for severance on this basis, the motion would likely have been allowed by a fair minded judge under the requirements and test in *United States v. Drougas,* 748 F. 2d 8 (1st. Cir. 1984).

> In order to be entitled to a severance on the basis of a codefendant's testimony the movant must demonstrate: (1) a bona

fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed [*Drougas* requirements]. Given such a showing, the court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion [*Drougas* test]." Id. 19, as quoted in *United States v. Burns, supra.*, 898 F. 2d 820 (citations omitted).

Petitioner would have met the initial *Drougas* requirements as shown in the discussion thus far.[20] With this showing made, there is substantial support for severance to avoid depriving petitioner of Brown's exculpatory evidence. See, also, K. Smith, *Massachusetts Practice, Criminal Practice and Procedure* (2d. ed., 1983 and 1997 supple.) §1063.

Although Brown would not have been John's only witness (as Jay was in *United States v. Burns* ), he would have been the only one corroborating and supporting John and his theory in defense in the three important respects discussed above: (1) John's location <u>outside</u> Walaikum's at all times; (2) talk in the car after the shooting showing his lack of prior knowledge of others having guns; and (3) Tinsley's three self-incriminating statements. The foregoing shows not only the need,

_____

[20] Severance should be granted under Mass.R.Crim.P.9(d) if the defendant can show that (1) the co-defendant will testify only if the trials are severed, (2) the testimony will be exculpatory, and (3) he has substantial need for the testimony. See *Commonwealth v. Beneficial Finance Co.*, 360 Mass. 188, 222, 275 N.E.2d 33 (1971). There, the court, while not reversing for failure to sever, cited federal cases that enumerated these factors. *Commonwealth v. Barrett*, 6 Mass. App. Ct., 952, 953, 383 N.E.2d 96 (1978) (rescript) and *Commonwealth v. Burke*, 20 Mass. App. Ct. 489, 510-511, 481 N.E.2d 494 (1985) also used these factors. As the discussion shows, defendant satisfies these factors.

substance, exculpatory nature and effect to satisfy the initial *Drougas* requirements, it also satisfies the first part of the *Drougas* test.

As to timeliness, the case was tried about 22 months after the incident. The docket entries suggest that all discovery and investigation would have been complete well before then, including discovery of Clarke's October 1995 statement. This is supported by inspection of trial counsel's files. [A.110] Petitioner would have waived his speedy trial rights in order to obtain Brown's testimony. [A.131] Counsel would have had ample time to have learned the nature of the evidence against and for John, and to have sought severance well before trial started. [A.129-131] In the instant case, neither judicial economy nor public interest in speedy trials outweighs the need for severance. John should not be penalized or faulted for his counsel's failing in this regard. The foregoing discussion shows that John was prejudiced by not having the use of Brown's exculpatory evidence which could have been obtained had counsel timely move for severance. Granting of severance in these circumstances would have been well within the discretionary powers of the trial judge where such fundamental rights are involved.

Counsel's strategy to blame Tinsley, but not to seek a severance so that John could be tried separately from Brown and Tinsley, was manifestly unreasonable. Counsel's tactical reason for not doing so was that he wanted Tinsley in the same courtroom with John while he was pointing the finger of blame. [A.251-253] Petitioner is aware of the

45

appellate opinions giving deference to reasonable strategy and tactics of trial counsel. Here, petitioner has shown that "some other action would have better protected [John] [] and was reasonably foreseeable as such before trial." *Beasley v. United States*, 491 F. 2d 687, 696 (6th Cir. 1974). Further on the question of foreseeability, an ordinary fallible lawyer also would have known well before the trial that Mr. Giblin, Tinsley's counsel would be very antagonistic to John, particularly, at trial. [A.130, 253][21] As the above discussion shows, as in *Commonwealth v. Moran*, 387 Mass. 644, 442 N.E.2d 399 (1982), "it appeared likely from pretrial discussions that [John and Tinsley] would attempt to escape conviction by blaming the other ..." *Id.* 660.[22] Although this mutual antagonism, alone, may not have warranted a request for severance, the virtually certain manifestations and harm to John throughout the trial should have given an ordinary fallible lawyer an additional reason for requesting severance so that Brown could provide exculpatory evidence that would have substantially strengthened John's case.

---

[21] Mr. Giblin often pointed the finger of blame at John. [*3/20-21; 6/161-169; 8/173-174; 10/113-130*] Brown's counsel also weighed in against John, by getting Holliday to go over the shooting at Cortees [*3/123*], then by having Detective Dorch repeat Neal's alleged February 10, 1995 statements [*5/30-39*], and then in his closing. [*10/95*]

[22] In the closings, John's counsel suggests that John has some burden on the joint venture question, raises questions about John's credibility [*10/50*], and finally points the finger of blame on Tinsley. [*10/52, 61*] Tinsley's counsel not only points the finger of blame at John, but also argues for the credibility of the Commonwealth's witnesses. [*10/116-121, 125*]

**D.    Counsel's failure to seek severance would meet the *Strickland* test on a more fully developed record.**

Aside from unreasonably misreading the record, and basing its conclusions thereon, the SJC's analysis of this issue was contrary to, and an unreasonable application of, Supreme Court precedent as set forth in *Strickland, supra*, 466 U.S. 668 (1984) and its progeny. See part II, *ante*, at 11-14.[23]

In this vein, the SJC's decision was contrary to, and an unreasonable application of Supreme Court precedent based on the foregoing facts and assistance of counsel standards, and on the unreasonable and unfounded presumptions/conclusions (see *Evans* at 439 Mass.197-198, 786 N.E.2d 388), as to what counsel knew or could have known about such things as (1) the content of Brown's testimony and; (2) the content of Willie Wiggins's testimony.

As to Brown, there is ample record evidence of what counsel knew or could have known about Brown's favorable testimony [A. 251-253, 227-229] And, contrary to the SJC's remarks on Wiggins, whatever defense counsel stated on the record on what he expected from Wiggins is not an indication that he acted reasonably by relying on Wiggins' evidence and not trying to obtain Brown's at trial. That Wiggins' testimony was at odds with counsel's representations, permitting the

---

[23] This issue is congruent with the situation in *Washington v. Texas, supra,* where defendant wished to call a co-defendant who would have testified consistently with his defense. *Id.*, 388 U.S. at 16.

47

prosecutor to comment thereon, is an indication of lack of preparation,
i.e., failure to adequately interview Wiggins pretrial to assess the
differences in the kind, degree, extent, and strength of Wiggin's evidence
as compared with Brown's and other potential defense witnesses. In fact,
petitioner raised an issue in his motion for new trial and in his appeal to
the SJC on improper prejudicial remarks in the prosecutor's closing
argument, disparaging Willie Wiggins' evidence. The prosecutor argued,
"You have the testimony of Willie Walaikum (sic) .... I was told the
expected testimony was going to be, 'I know Randy [another name for
John] Evans. He's a friend of mine, and he wasn't in the
restaurant.'"[10/142] The prosecutor then went on to deride Mr. Wiggins'
testimony. The SJC concluded that the remarks were fair comment,
because there was a disparity between Mr. Wiggins' evidence and the
promise counsel made in <u>his</u> opening about this evidence. More timely
pretrial investigation and preparation on the part of counsel would have
revealed this disparity, and would have supplied another strong basis for
seeking severance.

The initial question in the *Strickland* performance prong analysis is
what defense counsel knew or reasonably could have known and, then
whether on that basis he made a reasonable decision.

If counsel was not fully informed about the differences in the kind,
degree, extent, and strength of testimony from Wiggins, John, Jimmy
and Brown, he could not make a reasonable decision on the strategy he

48

ultimately chose, i.e., (1) to have the four co-defendants tried together, (2) to point the finger of blame at Tinsley on the limited amount of evidence thereon (without Brown's testimony), and (3) to have John testify, but thereby subject him to effective impeachment on cross-examination.

The question before this court is not whether counsel competently performed in choosing the strategy he ultimately employed, but rather whether it was incompetent of him not to pursue others. The Sixth Amendment inquiry is not an overall assessment of whether a defense counsel is generally competent; he/she may conduct an good cross-examination of a police officer or a forensic expert, and make an adequate closing argument, yet nevertheless render ineffective assistance of counsel by failing to be fully informed about the differences in kind, degree, extent, and strength of testimony of potential witnesses.

Without fully appreciating what the record shows counsel knew or could have known, and without knowing whether counsel acted reasonably and competently vis a vis Wiggins, the SJC's determination about the strength of a motion to sever was unreasonable. This court should require a more fully developed record before it rules on the two *Strickland* prongs. As stated, petitioner tried to develop the record in the state court, but was denied the opportunity through no fault of his own. That is why petitioner is requesting discovery and an evidentiary hearing.

### E.    Evidentiary hearing requested.

The AEDPA did not abolish Habeas Corpus Rule 6. Rule 6(a) gives the court discretion to allow discovery. Petitioner seeks confirmation of potential facts already revealed as a basis for the conclusions contained in the offer of proof he presented to the state courts. This confirmation would be made if Brown and his trial attorney, Mr. Sheketoff, and Evans' attorney, Mr. Hutton, were subpoenaed to a deposition or a hearing at which they would at least affirm, explain, and authenticate, where required, under oath the information they provided undersigned counsel. Those affirmations, explanations, and authentications would be invaluable to this court in deciding petitioner's claims and whether a writ for habeas corpus should issue. Hence, there is good cause to seek these confirmations.

The factors to be considered for mandatory hearings in a habeas corpus case are set forth in *Townsend v. Sain, supra,* 372 U.S. 313 (1963).

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

50

According to *Sanna, supra,* 265 F.3d. 9, the *Townsend* factors are still guidelines for a federal habeas determination of when an evidentiary hearing is mandatory post-AEDPA. The AEDPA only affected the fifth factor of the six listed in *Townsend.* The word "failure" in the opening clause of § 2254(e)(2) regarding failure to develop facts in the state courts as a bar to development in a federal habeas corpus court proceeding, means that it must be established that "failure" was due to lack of diligence, or some greater fault, attributable to petitioner or his post-conviction counsel, which certainly could not be shown in this case. If no lack of diligence, or some greater fault, attributable to petitioner or his counsel is established, then § 2254(e)(2) does not apply at all, and the fifth factor in *Townsend* comes back into play. *(Michael) Williams v. Taylor,* 529 U.S. 420, 430-437, 440-445 (2000). See, also, 1 *FHCPP* 814-816, nn. 22-23 and accompanying text for other cases cited.

Petitioner has made multiple and diligent efforts, during the state court proceedings, to uncover and to present in an evidentiary hearing the underlying facts to support his claims. An evidentiary hearing should be held on these grounds, because there have been no full and fair state court fact-findings thereon for reasons beyond the control of petitioner or his post-conviction attorney. *(Michael) Williams v. Taylor,* 529 U.S. 420, 430-437, 440-445 (2000) (inquiry into juror bias and prosecutorial misconduct); *Barnes v. Elo,* 231 F.3d 1025, 1029 (6th Cir. 2000) (inquiry into trial counsel's failure to call medical and alibi witnesses); *Caro v.*

51

*Calderon*, 165 F.3d 1223, 1228-29 (9th Cir.), cert. denied, 527 U.S. 1049 (1999) (inquiry into trial counsel's failures to investigate petitioner's neurological impairments and to provide his experts with relevant petitioner history). See also 1 *FHCPP* 908 (suggesting that the habeas petition must involve a "mini-trial" in federal court, consisting of 'the trial as it would have occurred but for prior counsel's unreasonable conduct, in order to show that a reasonably competent defense would have led to a more favorable outcome than did the actual trial.").

## CONCLUSION

Based upon the foregoing argument, the petition for writ of habeas corpus be should be granted on a single ground or cumulative effect of two or more grounds or, in the alternative, petitioner's motion for discovery and request for evidentiary hearing should be granted. Petitioner also requests such other or further relief as to this court is meet and just under the circumstances.

Respectfully submitted,

JOHN EVANS, by his attorney

Emanuel Howard, BBO No. 241740
P.O. Box 66067
Newton, MA 02466-0002
TEL. (617) 965-4042;  FAX (617) 965-3793

## CERTIFICATE OF SERVICE

I hereby certify that, on the date written below, I served a copy of the within document on respondent by sending it via first class mail, postage prepaid, to his counsel of record:

Susanne G. Reardon
Assistant Attorney General
Criminal Bureau
Commonwealth of Massachusetts
Office of the Attorney General
One Ashburton Place
Boston, MA  02108

_Kennedy_ 9/10/2004

Evans Memo. Support Pet. Writ HABEAS CORPUS